# CASES

## DECIDED IN THE

# SUPREME COURT OF GEORGIA

### AT THE

## MARCH TERM, 1907.

---

### MACK *et al. v.* KIME *et al.*

1. A voluntary religious society which constitutes a subordinate part of a religious organization having established tribunals authorized, either expressly or impliedly, to decide all questions of faith, discipline, rule, or ecclesiastical government, is bound by the decisions of such tribunals on all questions determined by them within the respective jurisdictions of each. In such cases, where a right of property, asserted in a civil court, is dependent on a question of doctrine, discipline, ecclesiastical law, rule, custom, or church government, and that question has been decided by the highest tribunal within the organization, to which it has been regularly and properly carried, the civil courts will accept that decision as conclusive, and be governed by it in its application to the case before it.

2. The general rule is that where property rights are involved, the civil courts will interfere to protect the members of an ecclesiastical organization who adhere to the tenets and doctrines which the organization was organized to promulgate, and protect them in the right to use the property, as against those members of the organization who are attempting to divert the same to purposes utterly foreign. The constituted authorities of a church can not, where members' rights are involved, entirely abandon the purposes for which the church was organized, and divert the property to other uses. The civil courts, in determining whether there has been an abandonment of the tenets and doctrines of the organization, will look to the decisions of the constituted tribunals of the church having jurisdiction to decide differences as to teachings and doctrines, and will in no case undertake to revise the judgment of such tribunal so long as the question before it was one clearly within its jurisdiction; and interference will only be had when it is manifest that what the church tribunal has adjudicated is not a difference of opinion as to doctrine or teachings, but an attempt, in the form of such adjudication, to utterly abandon the purposes for which the church was organized.

3. When property acquired by an ecclesiastical organization is devoted, by

1

the express terms of a gift, grant, or sale, to the support of any specific religious doctrine or belief, the civil courts, when necessary to protect the trust to which the property has been devoted, will inquire into the religious faith or practice of the parties claiming its use or control, and will see that it shall not be diverted from that trust. But if property is acquired in the ordinary way of purchase or gift, for the use of a religious society, the civil courts will only inquire as to who constitute that society, or its legitimate successors, and award to them the use of the property, but will not, in case of a schism in the organization, inquire into the existing religious opinion of those who adhere to the acknowledged organization.

4. The General Assembly of the Cumberland Presbyterian Church, under the constitution of that organization, has executive, legislative, and judicial authority. It is the highest court of the church, and also the highest authority in legislative and executive matters. When the provisions of the constitution in reference to the authority of the General Assembly are taken together with and in the light of the purposes for which the organization was formed, and the history and antecedents of the organization itself, a reasonable construction of the terms of the constitution gives to the General Assembly authority to determine whether the teaching and doctrines and form of government of another organization are in accord with it, and, if so, to unite with such organization upon such terms and under such name as the judgment of the General Assembly shall dictate.

Argued May 28,—Decided August 9, 1907.

Injunction. Before Judge Pendleton. Fulton superior court. September 28, 1906.

A brief historical statement as to the organization and progress of the Cumberland Presbyterian Church is appropriate and will be more or less helpful in the determination of the legal questions which will be hereafter discussed. The Cumberland Presbyterian Church was organized in Dickson county, Tennessee, February 4, 1810. It was the outgrowth of the great revival of 1800—one of the most powerful revivals that this country has ever witnessed. The founders of the church were Finis Ewing, Samuel King, and Samuel McAdow. They were ministers in what is now commonly known as the Northern Presbyterian Church, but they rejected the doctrine of election and reprobation, as taught in the Westminister Confession of Faith. These three ministers, on the date above referred to, met in a log cabin and organized an independent presbytery, calling it the Cumberland Presbytery; and this was the beginning of the Cumberland Presbyterian Church. In three years the church had become sufficiently large to form three presbyteries; and these presbyteries, in 1813, met

and constituted a synod. This synod, in a paper called the "Brief
Statement," set forth the points wherein the Cumberland Pres-
byterian dissented from the Westminister Confession. They were
as follows: "1. That there are no eternal reprobates. 2. That
Christ died not for a part only, but for all mankind. 3. That
all infants dying in infancy are saved through Christ and the
sanctification of the Spirit. 4. That the Spirit of God operates
on the world, or as coextensively as Christ has made atonement,
in such a manner as to leave all men inexcusable." In 1814 the
synod revised the Westminister Confession of Faith in the particu-
lars above referred to. Subsequently the General Assembly of
the Cumberland Presbyterian Church was formed; and in 1829
this judicature made such changes in the form of government as
were demanded by the formation of this court. Such, in brief.
was the early history of this church.

It is to be noted that in its form of government it patterned
largely, if not altogether, after the form of government of the
parent church. It asserted, in forcible and strong terms, the
differences which existed between it and the parent church; but
there seems to have been no substantial or material difference,
in the form of government which it adopted, from that which
the church from which it sprang was then using. The Cum-
berland Presbyterian Church grew in numbers and in influence,
and especially in the State in which it was organized and adja-
cent States; but its territory was not limited to these. In 1906
it contained 17 synods, 114 presbyteries, and a total membership
of nearly 200,000. As is true in nearly every case where there
is a division on ecclesiastical teachings, and a separation result-
ing therefrom, there were in this instance persons in both churches
who seemed to be desirous of reconciling the differences and
bringing together the two organizations upon such terms as would
be consistent with the consciences of each side. How far back
this desire for reunion may be traced is immaterial. In 1903 it
took definite shape, and committees were appointed by the General
Assemblies of the two churches to take into consideration the
question of the reunion of the two bodies. This movement for
reunion does not seem to have been limited merely to a reunion
of the two branches of the Presbyterian Church involved in the
present controversy, but was broader in its scope and intended to

accomplish, if practicable, the reunion and consolidation of the various ecclesiastical organizations in the United States that adhere to and teach the doctrines of what is commonly known as the Presbyterian Church.

The record discloses, in detail, the various steps that were taken by the General Assemblies of the two churches in reference to the union. This finally culminated in the report of the committee on union and reunion being adopted by the General Assembly at Decatur, Illinois, in May, 1906. This report set forth the terms upon which the union was to be established. The result of the vote of the General Assembly of the Cumberland Presbyterian Church was as follows:

Ministers voting in the affirmative .................... 85
Ruling elders voting in the affirmative ................ 78

Total affirmative vote ......................165
Ministers voting in the negative ...............50
Ruling elders voting in the negative ..........41
Total negative vote ....................... 91

Affirmative majority .................... 74

The moderator then declared that the resolution adopting the report of the committee on fraternity and union had been carried, and that thereby the report of the committee on fraternity and union had been accepted; and, in accordance with this report, the General Assembly adjourned sine die, to meet thereafter only as a component part of the General Assembly of the Northern Presbyterian Church. It also appeared that prior to the action of the General Assembly the question of reunion had been submitted to the different presbyteries, and one hundred and eleven presbyteries had expressed themselves, sixty of them voting approval, and fifty-one disapproval. It thus appears that a majority of the presbyteries and a majority of the commissioners in the General Assembly had declared in favor of the union. It is contended, however, by the dissenting members of the Cumberland Presbyterian Church that an analysis of the vote in the presbyteries will show that a majority of the individuals composing these presbyteries did not favor the reunion; that is, that while a majority of the presbyteries, as such, favored the union, the majority of the members composing the different presbyteries did not approve of

the union. Before the adjournment of the General Assembly at Decatur, those commissioners who were opposed to the union entered their protest against the adoption of the report of the committee; and after the General Assembly had adjourned without a date, to meet in subsequent years as a component part of the Northern Presbyterian Church, the dissenting members assembled themselves together and declared themselves to be the General Assembly of the Cumberland Presbyterian Church, and proceeded to exercise, as far as they could, the powers of such body. The case which we now have in hand is one of the numerous controversies which sprang up in the territory covered by the Cumberland Presbyterian Church, bringing in question the regularity of the alleged union between that church and the Northern Presbyterian Church.

Kime and others brought an equitable petition in behalf of the members of the First Cumberland Presbyterian Church of Atlanta, Georgia, against Mack and others, who were alleged to have been members of that church, but who now claim and profess to be officers and members of the Presbyterian Church in the United States of America (hereinafter referred to, for convenience, as the Northern Presbyterian Church), and the Penn Mutual Life Insurance Company, alleging, that the First Cumberland Presbyterian Church of Atlanta was an existing voluntary association of persons for the purpose of divine worship, etc., in harmony with the constitution, creed, etc., of the Cumberland Presbyterian Church, which had had its complete machinery for the administration of its affairs and property since its organization in 1810, and that the constitution and laws of said church did not authorize any person or body of persons to destroy its existence as a separate and distinct church, or to carry it over, as a body, with its property, into another organization; that the Northern Presbyterian Church is a separate and distinct church, having its peculiar constitution, creed, etc., as well as complete machinery for the administration of its affairs; that one important difference between the two churches is that the white and black races are not brought together in the presbyteries, synods, and assemblies of the Cumberland Presbyterian Church, while in the Northern Presbyterian Church this is possible, and is optional with the negro Presbyterian Churches; that the First Cumberland Presbyterian Church of At-

lanta owns certain described real property; that Kime and others are trustees of the Atlanta church and custodians of the title of the property owned by it, and, as such, they have made a loan deed to property owned by it, to secure an indebtedness of $5,000, evidenced by notes payable to the Penn Mutual Life Insurance Company, and $4,000 of said indebtedness is still unpaid; that it has other outstanding obligations to the extent of $2,200, or more; that Mack has been pastor of the church and still occupies the pulpit and exercises the functions of pastor thereof, not as a Cumberland Presbyterian minister, but as a minister of the Northern Presbyterian Church, of which he claims to be a member; that certain named parties are elders, and the only elders, of the Atlanta church, and that other named parties who were elders are still using the property and assuming to act in an official capacity, not as elders of the Cumberland Presbyterian Church, but as elders of the Northern Presbyterian Church; that the defendants, and the class whom they represent, were formerly members of the Cumberland Presbyterian Church, and have been for a long time advocating the destruction of that church and its union with the Northern Presbyterian Church, by virtue of which the Cumberland Presbyterian Church, with all its membership and property, would pass out of existence; that since May 24, 1906, they have been declaring that they are no longer members of the Cumberland Presbyterian Church, but members of the Northern Presbyterian Church, and that the Cumberland Presbyterian Church has passed out of existence and its property has passed into the Northern Presbyterian Church; that the said defendants are interfering with the plaintiffs and other loyal members of the Atlanta church in their efforts to worship in the building and the performance of other duties, and are preventing plaintiffs from so worshipping, and are usurping the rights of the members of the First Cumberland Presbyterian Church by holding all religious and business meetings of the said congregation as meetings of the Northern Presbyterian Church; that the defendants are attempting and threatening to proceed to have the property of the said First Cumberland Presbyterian Church transferred and assigned to the Northern Presbyterian Church; that the membership of the Atlanta church has heretofore numbered about one hundred, but since May 24, 1906, forty thereof, including the defendants, pro-

fess to have become members of the Northern Presbyterian Church, and about forty, including petitioners, still remain loyal members of the First Cumberland Church of Atlánta, and will not consent to any union with the Northern Presbyterian Church because they can not conscientiously do so, nor to the transfer of any property, and that the remainder of the membership have either withdrawn or remain indifferent to the results flowing from the alleged union; that the conduct of the defendants has greatly damaged the usefulness of the church and impaired its financial resources; that the rights of creditors are also seriously affected; that the property of the Atlanta church was donated and acquired by it for specific purposes and trusts to be carried out under the constitution of the Cumberland Presbyterian Church, and the transfer of the same to the Northern Presbyterian Church would be a diversion of trust funds; that subscriptions were made and collected upon the faith that the church was to continue as the Cumberland Presbyterian Church. The prayers of the petition were, that the defendants be enjoined from transferring the property of the Atlanta church, or any part thereof, to the Northern Presbyterian Church, and from interfering with the use and control of the property by the members of the Atlanta church, or in any manner changing the present status of the property and title, and from using, in the name of the Northern Presbyterian Church, the property of the Atlanta church, except by permission of that church. Upon this petition being presented to the judge, he granted a restraining order and set the case down for a hearing.

The defendants filed an answer, to which they attached numerous exhibits, from which appear the history of the organization of the Cumberland Presbyterian Church and the differences between the teachings and doctrines of that church and the Northern Presbyterian Church, and also the various efforts which had been made, from time to time, to reconcile the differences between these two branches of the Presbyterian Church, and in which are set forth in detail the different steps that had been taken by the two branches of the church looking to a reconciliation of the differences between the two and a union of the same, and also the various preliminary actions by the different bodies of the two churches which finally culminated, in 1906, in the union of the two branches of the church. At the hearing the evidence was voluminous, all bear-

ing upon the issues which were set forth in the pleadings. The judge granted an injunction as prayed for, his order stating: "The union between the Presbyterian Church of the United States of America and the Cumberland Presbyterian Church was null and void. The action of the General Assembly of the Cumberland Presbyterian Church seeking to effect such union was without constitutional authority and in conflict with the express provisions of their constitution." To the judgment granting the injunction the defendants excepted.

The following parts of the constitution of the Cumberland Presbyterian Church were in evidence:

### "CHURCH COURTS.

"24. It is necessary that the government of the Church be exercised under some certain and definite form, and by various courts, in regular gradation. These courts are denominated Church-sessions, Presbyteries, Synods, and the General Assembly.

"25. The Church-session exercises jurisdiction over a single Church; the Presbytery over what is common to the ministers, Church-sessions, and Churches within a prescribed district; the Synod over what belongs in common to three or more Presbyteries, and their ministers, Church-sessions, and Churches; and the General Assembly over such matters as concern the whole Church; and the jurisdiction of these courts is limited by the express provisions of the Constitution. Every court has the right to resolve questions of doctrine and discipline seriously and reasonably proposed, and in general to maintain truth and righteousness, condemning erroneous opinions and practices which tend to the injury of the peace, purity, or progress of the Church; and, although each court exercises exclusive original jurisdiction over all matters specially belonging to it, the lower courts are subject to the review and control of the higher courts, in regular gradation.

"27. The Church-session is charged with maintaining the spiritual government of the Church, for which purpose it is its duty to inquire into the doctrines and conduct of the Church-members under its care; to receive members into the Church; to admonish, suspend, or excommunicate those found delinquent, subject to appeal; to urge upon parents the importance of presenting their children for baptism; to grant letters of dismission, which, when given to parents, shall always include the names of their baptized children; to ordain and install ruling elders and deacons when elected, and to require those officers to devote themselves to their work; to examine the records of the proceedings of the deacons; to establish and control Sabbath-schools and Bible-classes, with especial reference to the children of the Church; to order collections for pious uses and Church purposes; to take the oversight of the singing in the public worship of God; to assemble the people for worship when there is no minister; to concert the best measures for promoting the spiritual interests of the Church; to observe and carry out the injunctions of the higher courts;

and to appoint representatives to the higher courts, and require on their return a report of their diligence.

"31. The Presbytery has the power to examine and decide appeals, complaints, and references brought before it in an orderly manner; to receive, examine, dismiss, and license candidates for the holy ministry; to receive, dismiss, ordain, install, remove, and judge ministers; to review the records of the Church-sessions, redress whatever they may have done contrary to order, and take effectual care that they observe the Government of the Church; to establish the pastoral relation, and to dissolve it, at the request of one or both of the parties, or where the interests of religion imperatively demand it; to set apart evangelists to their proper work; to require ministers to devote themselves diligently to their sacred calling, and to censure and otherwise discipline the delinquent; to see that the injunctions of the higher courts are obeyed; to condemn erroneous opinions which injure the purity or peace of the Church; to resolve questions of doctrine and discipline seriously and reasonably proposed; to visit particular Churches, to inquire into their condition, and redress the evils that may have arisen in them; to unite or divide Churches, with the consent of a majority of the members thereof, and, for cause, to dissolve the relations between it and a particular Church, which shall thereafter cease to be a constituent of the Cumberland Presbyterian Church, and forfeit all rights as such; to form and receive new Churches; to take special oversight of vacant Churches; to concert measures for the enlargement of the Church within its bounds; in general, to order whatever pertains to the spiritual welfare of the Churches under its care; to appoint representatives to the higher courts; and, finally, to propose to the Synod, or to the General Assembly, such measures as may be of common advantage to the Church at large.

"37. The Synod has power to receive and decide all appeals, complaints, and references regularly brought up from the Presbyteries; to review the records of the Presbyteries, and to redress whatever they may have done contrary to order; to take effectual care that Presbyteries observe the Government of the Church, and that they obey the injunctions of the higher courts; to create, divide, or dissolve Presbyteries, when deemed expedient; to appoint ministers to such work, proper to their office, as may fall under its own particular jurisdiction; in general, to take such order with respect to the Presbyteries, Church-sessions, and Churches under its care as may be in conformity with the principles of the Government of the Church and of the word of God, and as may tend to promote the edification of the Church; to concert measures for promoting the prosperity and enlargement of the Church within its bounds; and, finally, to propose to the General Assembly such measures as may be of common advantage to the whole Church.

• "40. The General Assembly is the highest court of this Church, and represents in one body all the particular Churches thereof. It bears the title of the General Assembly of the Cumberland Presbyterian Church, and constitutes the bond of union, peace, correspondence, and mutual confidence among all its Churches and courts.

"43. The General Assembly shall have power to receive and decide all

appeals, references, and complaints regularly brought before it from the inferior courts; to bear testimony against error in doctrine and immorality in practice, injuriously affecting the Church; to decide in all controversies respecting doctrine and discipline; to give its advice and instruction, in conformity with the Government of the Church, in all cases submitted to it; to review the records of the Synods; to take care that the inferior courts observe the Government of the Church; to redress whatever they may have done contrary to order; to concert measures for promoting the prosperity and enlargement of the Church; to create, divide, or dissolve Synods; to institute and superintend the agencies necessary in the general work of the Church; to appoint ministers to such labors as fall under its jurisdiction; to suppress schismatical contentions and disputations, according to the rules provided therefor; to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this Church; to authorize Synods and Presbyteries to exercise similar power in receiving bodies suited to· become constituents· of those courts, and lying within their geographical bounds respectively; to superintend the affairs of the whole Church; to correspond with other Churches; and in general, to recommend measures for the promotion of charity, truth, and holiness throughout all the Churches under its care.

"60. Upon the recommendation of the General Assembly, at a stated meeting, by a two-thirds vote of the members thereof voting thereon, the Confession of Faith, Catechism, Constitution, and Rules of Discipline may be amended or changed when a majority of the Presbyteries, upon the same being transmitted for their action, shall approve thereof. The other parts of the Government—that is to say, the General Regulations, the Directory for Worship, and the Rules of Order—may be amended or changed at any meeting of the General Assembly by a vote of two-thirds of the entire number of Commissioners enrolled at that meeting, provided such amendment or ·change shall not conflict, in letter or spirit, with the Confession of Faith, Catechism, or Constitution."

The defendants in error contend that the teachings of the Cumberland Presbyterian Church and the Northern Presbyterian Church are radically different; which they claim appears when the teachings and doctrines of the two churches are placed side by side, as they are in the parallel columns which follow:

PRESBYTERIAN CHURCH IN THE UNITED STATES OF AMERICA.

CONFESSION OF FAITH.

CHAPTER III.

OF GOD'S ETERNAL DECREE.

III. By the decree of God, for the manifestation of His glory, some men and angels are predestined unto everlasting life, and others fore-ordained to everlasting death.

CUMBERLAND PRESBYTERIAN CHURCH.

CONFESSION OF FAITH.

DECREES OF GOD.

8. God, for the manifestation of His glory and goodness, by the most wise and holy counsel of His own will, freely and unchangeably ordained or determined what he himself would do, what He would require His intelligent crea-

IV. These angels and men thus predestined and fore-ordained are particularly and unchangeably designed; and their number is so certain and definite that it can not be either increased or diminished.

V. Those of mankind that are predestined unto life, God, before the foundation of the world was laid, according to His eternal and immutable purpose, and the secret counsel and good pleasure of His will, hath Chosen in Christ, unto everlasting glory, out of His mere free grace and love, without any foresight of faith or good works, or perseverance in either of them, or any other thing in the creature, as conditions or causes moving Him thereunto; and all to the praise of His glorious grace.

VI. As God hath appointed the elect unto glory, so hath He, by the eternal and most free purpose of His will, fore-ordained all the means thereunto. Wherefore they who are elected, being fallen in Adam, are redeemed by Christ, are effectually called unto faith in Christ by his spirit working in due season; are justified, adopted, sanctified and kept by His power through faith unto salvation. Neither are any other redeemed by Christ, effectually called, adopted, justified, sanctified and saved, but the elect only.

VII. The rest of mankind, God was pleased, according to the unsearchable counsel of His own will, whereby He extendeth or withholdeth mercy as He pleaseth, for the glory of His sovereign power over His creatures, to pass by, and to ordain them to dishonor and wrath for their sin, to the praise of His glorious justice.

tures to do, and what should be the awards respectively of the obedient and the disobedient.

9. Though all divine decrees may not be revealed to men, yet it is certain that God has decreed nothing contrary to His revealed will or written Word.

### FREE WILL.

34. God, in creating man in his own likeness, endued him with intelligence, sensibility and will, which form the basis of moral character, and render man capable of moral government.

35. The freedom of the will is a fact of human consciousness, and is the sole ground of human accountability. Man in his estate of innocence, was both free and able to keep the Divine law, also to violate it. Without any constraint, from either physical or moral causes, he did violate it.

### The Larger Catechism.

Q. 12. What are the decrees of God?

A. God's decrees are the wise, free and holy acts of the Council of His will, whereby, from all eternity He hath, for His own glory, unchangeably fore-ordained whatsoever comes to pass in time, especially concerning angels and men.

Q. 13. What hath God especially decreed concerning angels and men?

A. God, by an eternal and immutable decree, out of His mere love for the prayers of His glorious grace, to be manifested in due time, hath elected some angels to glory; and in Christ hath chosen some men to eternal life, and the means thereof; and also, according to His sovereign power, and the unsearchable counsel of His own will (whereby He extendeth or withholdeth favor as He pleaseth), hath passed by, and fore-ordained the rest to dishonor and wrath, to be for their sin inflicted, to the praise of the glory of His justice.

### The Shorter Catechism.

Q. 7. What are the decrees of God?

A. The decrees of God are His eternal purpose according to the counsel of His will, whereby, for His own glory, He hath fore-ordained whatsoever comes · to pass.

### CHAPTER X.

### OF EFFECTUAL CALLING.

1. All those whom God hath predestined unto life, and those only, He is pleased in His appointed and accepted time, effectually to call by His Word and Spirit, out of that state of .sin and death, in which they are by

### CATECHISM.

Q. 7. What are the decrees of God?

The decrees of God are His wise and holy purposes to do what shall for His glory. Sin not being for His glory, therefore, He has not decreed it.

### DIVINE INFLUENCE.

38. God, the Father, having set forth His Son, Jesus Christ, as a propitiation for the sins of the world, does most graciously vouchsafe a manifestation of the Holy Spirit with the same intent to every man.

nature, to grace and salvation by Jesus Christ; enlightening their minds spiritually and savingly, to understand the things of God; taking away their heart of stone, and giving unto them a heart of flesh; renewing their wills, and by his almighty power determining them to that which is good; and effectually drawing them to Jesus Christ, yet so as they come most freely, being made willing by His grace.

II. This effectual call is of God's free and special grace alone, not from anything at all foreseen in man, who is altogether passive therein, until, being quickened and renewed by the Holy Spirit, he is thereby enabled to answer this call, and to embrace the grace offered and conveyed in it.

III. Elect infants, dying in infancy, are regenerated and saved by Christ through the Spirit, who worketh when, and where, and how he pleaseth. So also are all elect persons, who are incapable of being outwardly called by the ministry of the Word.

IV. Others, not elected, although they may be called by the ministry of the Word, and may have some common operations of the Spirit, yet they never truly come to Christ, and therefore can not be saved; * *

THE LARGER CATECHISM.

Q. 67. What is effectual calling?

A. Effectual calling is the Work of God's almighty power and grace, whereby (out of His free and especial love to His elect, and from nothing in them moving Him thereunto) He doth in His accepted time invite and draw them to Jesus Christ, by His Word and Spirit, savingly enlightening their

## REGENERATION.

51. Those who believe in the Lord Jesus Christ are regenerated, or born from above, renewed in spirit, and made new creatures in Christ.

54. All infants dying in infancy, and all persons who have never had the faculty of reason, are regenerated and saved.

minds, renewing and powerfully determining their wills, so as they (although in themselves dead in sin) are hereby made willing and able, freely to answer His call, and to accept and embrace the grace offered and conveyed therein.

Q. 68. Are the elect only effectually called?

A. All the elect, and they only, are effectually called; although others may be and often are outwardly called by the ministry of the Word, and have some common operation of the Spirit; who, for their wilful neglect and contempt of the grace offered to them, being justly left in their unbelief, do never truly come to Jesus Christ.

THE SHORTER CATECHISM.

Q. 19. What is the misery of that estate whereinto man fell?

A. All mankind, by their fall, lost communion with God, are under His wrath and curse, and so made liable to all the miseries of this life, to death itself, and to the pains of hell forever.

Q. 20. Did God leave all mankind to perish in the estate of sin and misery?

A. God, having out of His mere good pleasure, from all eternity, elected some to everlasting life, did enter into a covenant of grace, to deliver them out of the estate of sin and misery, and to bring them into an estate of salvation by a Redeemer.

Q. 21. Who is the Redeemer of God's elect?

A. The only Redeemer of God's elect is the Lord Jesus Christ, who, being the eternal son of God, became man and so was and continueth to be God and Man, in two distinct natures and one person forever.

CATECHISM.

21. What are the evils of that estate into which mankind fell?

Mankind, in consequence of the fall, have no communion with God, discern not spiritual things, prefer sin to holiness, suffer from the fear of death and remorse of conscience, and from the apprehension of future punishment.

22. Did God leave mankind to perish in this estate?

No; God, out of His mere good pleasure and love, did provide salvation for all mankind.

23. How did God provide salvation for mankind?

By giving His Son, who became man, and so was and continues to be, both God and man in one person, to be a propitiation for the sins of the world.

## CHAPTER XI.

### OF JUSTIFICATION.

1. Those whom God effectually calleth, He also justifieth; * *

IV. God did, from all eternity, decree to justify all the elect; and Christ did in the fullness of time die for their sins, and rise again for their justification; nevertheless they are not justified, until the Holy Spirit doth, in due time actually apply Christ unto them.

## CHAPTER XIII.

### OF SANCTIFICATION.

1. They who are effectually called and regenerated, having a new heart and a new Spirit created in them, are further sanctified, really and personally, through the virtue of Christ's death and resurrection, by His Word and Spirit dwelling in them: * *

THE LARGER CATECHISM.

Q. 75. What is sanctification?

A. Sanctification is a work of God's grace, whereby, they whom God hath before the foundation of the world chosen to be holy, are in time, through the powerful operation of His Spirit, applying the death and resurrection of Christ unto them, renewed in their whole man after the image of God; * *

## CHAPTER XIV.

### OF SAVING FAITH.

1. The grace of faith, whereby the elect are enabled to believe to the saving of their souls, is the work of the Spirit of Christ in their hearts; and is ordinarily wrought by the ministry of the Word; by which also, and by the administration of the Sacraments, and prayer, it is increased and strengthened.

### JUSTIFICATION.

48. All those who truly repent of their sins, and in faith commit themselves to Christ, God freely justifies. * * *

### SAVING FAITH.

45. Saving faith, including assent to the truth of God's Holy Word, is the act of receiving and resting upon Christ alone for salvation, and is accompanied by contrition for sin and a full purpose of heart to turn from it and to live unto God.

## CHAPTER XVII.
## OF THE PERSEVERANCE OF THE SAINTS.

1. They whom God hath accepted in His beloved, effectually called and sanctified by the Spirit, can neither totally nor finally fall away from the state of grace; but shall certainly persevere therein to the end, and be eternally saved.

II. This perseverance of the saints depends, not upon their own free will,' but upon the immutability of the decree of election, flowing from the free and unchangeable love of God the Father; upon the efficacy of the merit and intercession of Jesus Christ; the abiding of the Spirit of the seed of God within them; and the nature of the covenant of Grace; from all which ariseth also the certainty and infallibility thereof.

## PRESERVATION AND BELIEVERS.

60. Those whom God hath justified He will also glorify; consequently, the truly regenerated soul will not totally fall away from a state of grace, but will be preserved to everlasting life.

61. The preservation of believers depends on the unchangeable love and power of God, the merits, advocacy, and intercession of Jesus Christ, the abiding of the Holy Spirit and seed of God within them, and the nature of the covenant of grace.   *   *

*John M. Gaut* and *E. V. Carter,* for plaintiffs in error.

*W. C. Caldwell, E. Marvin Underwood,* and *J. J.. McClellan,* contra.

COBB, P. J.   (After stating the facts.)

1. The present case presents one of those controversies which have, unfortunately, in the past, often found their way into the civil courts of this country. The courts of this State have been remarkably free from cases originating in schism in a religious body. Numerous cases appear in the briefs of counsel, from different courts of this country, as well as' some in the English and Scottish courts, involving controversies growing out of differences of opinion between parties and factions in ecclesiastical. organizations. On account of the union between the church and the government in England, the decisions of the civil courts of that country can not be implicitly followed by the courts of this country, where the civil authorities have no right to interfere in matters peculiarly ecclesiastical. The first amendment to the constitution of the United States denies to Congress the power to make any law respecting an establishment of religion or prohibiting the free

exercise thereof. Civil Code, § 6014. That instrument contains no limitation on the powers of the States in this particular, but every State in the Union has in its constitution a provision denying to the civil authorities the right to control or interfere in any way in matters purely ecclesiastical. The people of no State in the Union, as a political entity, have any creed or religion. The people of the United States, as a political entity, have no creed or religion. Each individual within the jurisdiction of the United States, whether he be within the limits of a State or elsewhere, has a right to determine for himself all of those questions which relate to his relation to the Creator of the universe. No civil authority can coerce him to accept any religious doctrine or teaching, or restrain him from associating himself with any class or organization which promulgates religious teaching. Whether he shall adopt any religious views, or, if so, what shall be the character of those views, and the persons with whom he shall associate in carrying out the particular views, are all questions addressed to his individual conscience, which no human authority has the right, even in the slightest way, to interfere with, so long as his practices in carrying out his peculiar views are not inconsistent with the peace and good order of society. We have confined our investigations in this case almost entirely to the decisions of the courts of this country, for the reasons above referred to.

When an individual becomes a member of a religious organization, his uniting with it is his voluntary act, and he becomes bound by the rules and usages of the organization. A religious association usually adopts a constitution, by-laws, and form of government. A member, when he enters the organization, voluntarily assumes the duty of obeying the laws of the association. As to all matters purely ecclesiastical he is bound by the decisions of the tribunal fixed by the organization to which he belongs, as an arbiter to determine the disputed questions relating to matters peculiarly within the province of the organization. In attempting to carry out the purpose for which religious associations are formed it becomes necessary, in almost every instance, for the organization to hold and own property. The members of the organization therefore become interested in the property so owned. Differences may arise which bring about disputes as to what interest a member or class of members of an organization may have in this property.

Rights of property are as peculiarly within the jurisdiction of the civil courts of the land as purely religious rights are within the jurisdiction of the ecclesiastical tribunals of a religious organization. How far the civil courts will interfere in the affairs of a religious body, where property rights are involved, is a question which has been addressed to many courts of this country. Often the controversy as to the right of property grows out of a controversy as to creed, doctrine, or teaching. While all of the rulings of the American courts can not be said to be entirely uniform, the great weight of authority is to the effect that if a religious organization has, under its form of government, a tribunal constituted with jurisdiction to decide differences between its members as to creed, teaching, or doctrine, the civil courts will not undertake to review or revise the judgment of the church tribunal in reference to such matters. The cases which support this ruling seem to be founded upon sound reasoning, when we take into consideration the constitutional provisions which deny to Congress and the lawmaking powers of the different States the right to interfere in matters purely ecclesiastical. In some cases it has been said that the decisions of the church tribunals are persuasive and not to be departed from by the civil courts except where the decisions are clearly wrong. But the sounder rule is that laid down in those cases in which it is held that if the matter relates to creed, doctrine, or teaching, the judgment of the constituted church tribunal is absolutely conclusive upon the civil courts, whether, in the opinion of the judges of such courts, the decision appears to be right or wrong. Where a right of property turns upon such a decision, the civil courts will allow the property to go in that direction in which the decision of the church tribunal carries it.

One of the leading cases on the subject in this country is Watson v. Jones, 13 Wallace, 679, 20 L. ed. U. S. 666. It was there held that in a case where the right of property asserted in the civil court is dependent upon a question of doctrine, discipline, ecclesiastical law, rule, custom, or church government, and that question has been decided by the highest tribunal within the organization to which it has been carried, the civil courts will accept that decision as conclusive and be governed by it in its application to the case before it. In the opinion Mr. Justice Miller says: "It is not to be supposed that the judges of the civil courts can be as

competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in law, which should decide the case, to the one which is less so" (p. 729). See also 7 Rose's Notes, 769; Brundage v. Deardorf, 92 Fed. 214 (34 C. C. A. 304); Schweiker v. Husser, 146 Ill. 399 (34 N. E. 1022); Lamb v. Cain, 129 Ind. 486 (14 L. R. A. 518, 29 N. E. 13); Watson v. Avery, 65 Ky. 332; Trustees v. Harris, 73 Conn. 216 (47 Atl. 116); White Lick Quarterly Meeting of Friends by Hadley v. White Lick Quarterly Meeting of Friends by Mendenhall, 89 Ind. 136.

2. The constituted tribunal of the religious organization has jurisdiction to determine all ecclesiastical questions which are submitted to it under the law and usages of the society. It has also the authority to determine for itself whether it has jurisdiction in a given case. The highest church court of a religious society is like the highest civil court. It has submitted to it not only questions growing out of controversies, but it has, of necessity, imposed upon it the duty and responsibility of determining what are within the limits of its jurisdiction. In the case of Watson v. Farris, 45 Mo. 183, it was held that the General Assembly of the Presbyterian Church, commonly known as "Old School," possesses extensive original and appellate jurisdiction, and whether a case is regularly or irregularly before it is a subject for it to determine for itself. In the opinion Judge Wagner says (p. 197): "Now, the General Assembly is the highest court or judicatory known to the Presbyterian Church; it possesses extensive original and appellate jurisdiction; and whether the case, in the matter of the Declaration and Testimony signers, was regularly or irregularly before it, was a subject for it to determine for itself, and no civil court can revise, modify, or impair its action in a matter of purely ecclesiastical concern." When a controversy involving the rights of a member is presented to the civil courts they will examine into the constitution and laws of the religious society, to determine whether a tribunal has been erected for the decision of ecclesiastical questions, and they will also examine into the laws of the association to determine whether the decision by the tribunal was concerning a matter which was within its jurisdiction. If its jurisdiction depends upon the construction of its own laws, and such laws have, either

expressly or impliedly, conferred upon it the right to determine the limits of its jurisdiction, the decision of the church tribunal as to its jurisdiction will be no less binding than its decision on the merits of the ecclesiastical question determined by it.

However, if it develops, from an examination of the constitution, laws, and usages of the church, that the judgment is beyond the jurisdiction of the church tribunal, and so manifestly beyond it that there can be no difference of opinion as to this fact, the civil courts will interfere to protect the members in their rights of property, involved in such a lawless and revolutionary action by the ecclesiastical organization. Where it is manifest that the church court has decided a question which, under no reasonable construction of the rules of the church, could be within the jurisdiction of the tribunal, the civil courts will recognize, as the true church, those members who adhere to the tenets and doctrines of the organization, and who are adhering to the rules of the church and living under the form of government prescribed by its constitution, and cause the property to follow the line as recognized by this class. So long as church tribunals merely decide questions which arise from time to time in regard to the teachings, doctrines, or government of the church, connected with the purposes for which it was organized, the civil courts, even though rights of property are involved, will not interfere. But whenever a majority in those organizations in which a majority of the members ordinarily control, or where the highest courts in those organizations which provide for various courts to determine these questions, take such steps as to clearly indicate an abandonment of the original scheme and purpose of the organization, and use it for ends which were not expressly contemplated, and, under no reasonable construction of the rules, could ever have been contemplated, those who are faithful to the original purposes of the organization are to be treated as the true church and the owners of the property committed to it for the promulgation of its teachings and doctrines. In Mt. Zion Baptist Church *v.* Whitmore, 83 Iowa, 138 (13 L. R. A. 198, 49 N. W. 81), it was held that the majority of the members of a Baptist church, although it was independent in government, have no power to divert the church property to the propagation of doctrines contrary to Baptist articles of faith and church covenants, and on attempting to do so they may be enjoined from interfering

with the proper use and control of the property by the minority. It was also held, in that case, that the decision of a Baptist council, on the joint call of both factions of a Baptist church, which agree to accept it as final, that the doctrines taught by the majority faction are not in harmony with the teachings of the denomination, is conclusive and may be adopted by a court as the basis of its action in giving the control of the church property to the other faction. In Christian Church v. Church of Christ, 219 Ill. 503 (76 N. E. 706), the ruling was that where members of a religious congregation divide and a new organization is formed by the withdrawing faction, the title to property of the congregation remains in the part of the congregation which adheres to the tenets and doctrines originally taught by the congregation to whose use the property was originally dedicated. There was also a ruling to the effect that where members of a seceding faction of a congregation form a new organization and teach and practice innovations not recognized or taught by the original congregation, they abandon their interest in the property belonging to the original congregation at the time of the division. See also Smith v. Pedigo, 145 Ind. 361 (19 L. R. A. 433, 32 L. R. A. 838, 33 N. E. 777); Ferraria v. Vasconcellos, 31 Ill. 25; Hale v. Everett, 53 N. H. 9 (16 Am. Rep. 82); Schnorr's Appeal, 67 Penn. St. 138 (5 Am. Rep. 415); Appeal of Ramsey, 88 Penn. St. 60; Bear v. Heasley, 98 Mich, 279 (57 N. W. 270, 24 L. R. A. 615).

The principle at the foundation of all these rulings, as well as a great many others along the same line that might be cited, is, that property which is devoted to the purposes of a given religious organization must be used for the purpose to which it is devoted, and that where the controlling authority of the organization (whether it be a majority of the congregation of those churches having a congregational form of government or the highest court of a church in those churches which have different tribunals, with appeals from one to the other) engages in a palpable attempt to divert the property to a purpose utterly variant from that to which it was originally devoted, the civil courts will interfere, even at the instance of a minority, in cases where the form of church government is congregational, or at the instance of the dissenters, without regard to number, where the form of government is other than congregational, and protect them in their property rights

against those who, without authority, are attempting to carry the property along lines that are utterly variant from the purpose for which the organization was formed. But in all cases of this character it must appear that the governing authorities of the church have abandoned the tenets and doctrines of the original organization. Whether they have so abandoned them is an ecclesiastical question; and if, under the form of government of the church, there is a tribunal of any character erected for the decision of these questions, the civil courts will not undertake to revise or review the judgment of this tribunal, provided the question is of such a character that it would admit of dispute and would therefore be proper for decision by the ecclesiastical tribunal. So long as the case rests upon debatable ground, as to whether there has been an abandonment of the purpose of the original organization, the courts will allow the judgment of the church tribunal to stand without question; but where, in a given case, the facts are such that there can be no question that there has been a complete abandonment, and, as a result, the property will be diverted to purposes never contemplated by the original organization, the civil courts will interfere at the instance of those who adhere to the teachings of the original association. If property is acquired by a Baptist church, which, at the time of its organization, is teaching the doctrines of the Baptist faith as it is ordinarily understood, and thereafter a majority of the congregation should determine to dissolve the organization and unite with an ecclesiastical body which is teaching doctrines utterly antagonistic to what are commonly understood as the doctrines of the Baptist church, the civil courts would protect the minority who adhere to the doctrines of the original organization, in their right to hold the property, even though such minority consisted of only one person. But if the question should arise in a Baptist congregation as to what is the doctrine of the Baptist church, and the difference should be such as that it was manifest that there could be, in the light of the history of the particular church, and other churches of similar faith, doubt as to what was the true rule to be followed by a Baptist church, and the church tribunal, constituted according to the customs and usages of Baptist churches, should decide these differences, the civil courts would not attempt to interfere with the judgment of this tribunal determining the doctrinal differences between the members of the congregation.

There is a radical difference between an abandonment of all the teachings and doctrines of a church and a mere difference of opinion among the members of an organization as to what are the true doctrines and teachings of the organization. There may be cases where an entire abandonment will be attempted, and such intention would be clear and palpable. But the cases which are most apt to arise are those which are upon the border line, when it is hard to determine, in the particular case, whether the action of the constituted authorities of the church is an abandonment of its original teachings or merely a judicial determination as to what are the true teachings of the church. The fact that there are cases lying so near to this border line is the reason that there are apparently conflicting decisions by the courts in this country as to when it is proper for the civil courts to interfere in the affairs of an ecclesiastical organization. It is true, in this class of cases, as it is in every case arising under the law, that the civil courts have generally laid down the correct rule, that they will not interfere with the affairs of an ecclesiastical organization, where the rights of property are involved, unless there has been a palpable attempt by the governmental authorities of the church to abandon altogether the teachings of the original organization. But there are cases where this rule has been, as to the facts of the particular controversy, wrongly applied. If the members of a church abandon the tenets of the church, they lose their interest in the property of the church. If they adhere to the doctrines of the church, but abandon the organization, they also lose their interest in the property of the church. This latter proposition is, in effect, the ruling in the case of *Godfrey* v. *Walker*, 42 *Ga.* 562. In that case the property was conveyed to trustees for the use of the colored members of the Methodist Episcopal Church, South, within the jurisdiction of the General Conference of that church, and a large portion of the congregation severed their connection with this church and united with the African Methodist Episcopal Church; and it was held that they thereby lost all their interest in the property, and it became subject to the control of the General Conference of the Methodist Episcopal Church, South, and did not become the property of the African Methodist Episcopal Church.

The code declares, "The majority of those who adhere to its organization and doctrines represent the church. The withdrawal by

one part of a congregation from the original body, or uniting with another church or denomination, is a relinquishment of all rights in the church abandoned" (Civil Code, § 2360). It will be noted that this section is a mere codification of the ruling made in *Bates* v. *Houston,* 66 *Ga.* 198. That case involved a controversy arising in a Baptist church which had a congregational form of government. The rule laid down there is the one which is laid down by all the courts, and which is the one above referred to, that the abandonment of the teachings of the church by members of the organization will cause them to lose their interest in the property of the original organization which was set apart for the promulgation of certain teachings. No question as to the effect of the ruling of ecclesiastical tribunals in reference to mere difference as to what were the doctrines of the church was involved in that case. But another general rule, recognized by all of the courts, was also laid down in that case, which is embodied in the Civil Code, § 2362, in the following language: "Courts are reluctant to interpose in questions affecting the management of the temporalities of a church; but when property is devoted to a specific doctrine or purpose, the courts will prevent it from being diverted from the trust." The case of *Harris* v. *Brown,* 124 *Ga.* 310 (52 S. E. 610, 2 L. R. A. (N. S.) 828), did not involve any of the questions now before us, and the section of the code last cited was simply mentioned to emphasize the rule therein laid down.

3. When an ecclesiastical organization acquires property by deed or will or other instrument, and the instrument, in express terms, provides that the property shall be devoted to the teaching, support, and spread of some specific form of doctrine or belief, the civil courts have authority to interfere in the affairs of the organization for the purpose of preventing a diversion of the property from the uses to which it was, by the instrument, devoted. This rule is laid down and recognized by Mr. Justice Miller in the case of Watson *v.* Jones, supra. See also First Baptist Church of Paris *v.* Fort, 93 Tex. 215 (54 S. W. 892, 49 L. R. A. 617). But where property is acquired by an ecclesiastical organization and there is nothing in the instrument under which the title passes to the organization, or to trustees in its behalf, which imposes a limitation upon the uses to which the property shall be devoted, it is to be presumed that it was the intention of the donor that the property was to be de-

voted to religious purposes, and in such manner and in such way
as the governing body of the organization, whatever it may be,
shall, under its constitution and rules, determine; and so long as
any existing religious organization can be ascertained to be that
organization, or its regular legitimate successor, it is entitled to
the use of the property.  See Baptist Church v. Fort, supra.  In
case of a schism in such an organization no inquiry will be had into
the existing religious opinions of those who comprise the legal and
regular organization; the proper inquiry is, which of the two fac-
tions constitute the church; and those who adhere to the acknowl-
edged organization are entitled to the use of the property, whether
adhering or not to the doctrines originally professed.  Watson v.
Jones, supra; Baptist Church v. Fort, supra.

4.  The instrument under which the Cumberland Presbyterian
Church of Atlanta acquired title, through its trustees, to the prop-
erty in controversy does not in express terms provide that the
property shall be used for the promotion of any particular teaching
or doctrine.  The trustees hold the title for the benefit of the
ecclesiastical organization known as the "Cumberland Presbyterian
Church," of which the Atlanta church was a component part.
Hence there is nothing in the present case which authorizes the
interference of the civil courts upon the ground that there has
been a diversion of a trust fund on account of a violation of the
terms of the instrument creating the trust.  The title to the prop-
erty was acquired in the ordinary way, by gift or purchase, without
limitation, except that it was to be used for religious purposes, and
the religious purposes are those of the Cumberland Presbyterian
Church.  The only question to be determined, therefore, is
whether, under the form of government of the Presbyterian Church,
the property of the Atlanta church can be transferred to the North-
ern Presbyterian Church.  In determining this question inquiry
must be had into the constitution and rules of the Cumberland
Presbyterian Church.  If, under the form of government of the
church, the governmental authorities have a right to make this
transfer, the civil courts will not interfere.  If they have not the
right, interference may be had at the instance of those who can be
designated as the lawfully constituted authorities of the Cumber-
land Presbyterian Church.  The controlling question, therefore, is,
whether, under the form of government as set forth in the constitu-

tion of the Cumberland Presbyterian Church, the governmental authorities of that body had the right to unite with the Northern Presbyterian Church.

The constitution of the church creates certain church courts. It declares that the government of the church is to be exercised in some certain and definite form, and by various courts, in regular gradation. These courts are denominated "church sessions," "presbyteries," "synods," and the "General Assembly." The jurisdiction of each of these courts is defined in the constitution. The church session has jurisdiction of a single church. The presbytery has jurisdiction over the church sessions, and jurisdiction within a prescribed district. The synod has jurisdiction over three or more presbyteries. And the General Assembly has jurisdiction over such matters as concern the whole church. Every court is declared to have the right to resolve questions of doctrine and discipline seriously and reasonably proposed. And although each court exercises exclusive and original jurisdiction over all matters especially belonging to it, the lower courts are subject to the review and control of the higher courts, in regular gradation. The General Assembly has jurisdiction to review and decide all references and complaints regularly brought before it from the inferior courts, and to decide all questions respecting doctrine and discipline, and "to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church." So far as any controversies in reference to doctrine are concerned, by the very terms of the constitution the General Assembly is made the highest court, and, of course, its judgment on the matter is final and conclusive. The General Assembly of the Cumberland Presbyterian Church, hence, has jurisdiction to determine whether the matter in controversy is within its jurisdiction, and also to determine the controversy itself.

On the question as to whether there should be a reunion of the Cumberland Presbyterian Church and the Northern Presbyterian Church, it was for the determination of the General Assembly whether these two organizations were in accord with each other as to doctrine and order. This question was determined by the General Assembly at Decatur, Illinois, in 1906. That it was a question about which there could be honest differences of opinion is manifest; for these differences appear in the records of the proceed-

ings prior to and at the time the judgment was rendered that there was no substantial difference between the two organizations in teachings and doctrines. There were members of the General Assembly of the Cumberland Presbyterian Church who not only took a contrary view, but entered their protest upon the minutes of the General Assembly, and who thereafter withdrew and organized themselves into a body which they styled "The True Cumberland Presbyterian Church." We will not undertake to determine whether this judgment of the General Assembly is correct. The constituted tribunal of the church has determined the question, and, whether determined rightly or wrongly, we, as a civil court, having no ecclesiastical jurisdiction whatever, will not attempt to revise the conclusions and findings of those who are learned in the ecclesiastical law. The General Assembly of the Cumberland Presbyterian Church has accepted the declaration of the Northern Presbyterian Church as to its interpretation of its confession of faith; and when so accepted, it has determined that there is no substantial or reasonable difference between the teachings and doctrines of the two organizations. This question is therefore to be treated as settled forever by the judgment of the General Assembly of the Cumberland Presbyterian Church.

With this question settled, the other question arising is, has the General Assembly of the Cumberland Presbyterian Church authority, under the constitution of the church, to provide for a reunion with the Northern Presbyterian Church? In Fussell v. Hail, a case decided on June 1, 1907, by the Appellate Court for the Third District of Illinois, the identical question with which we are now confronted was involved. The very act of the Cumberland Presbyterian Church which is now in controversy was involved in that case. In the opinion Ramsay, P. J., after referring to the authority of the General Assembly of the Cumberland Presbyterian Church. as indicated in the constitution, says: "The effect of such sections is to make the general assembly not only a legislative and administrative body, but one with judicial powers upon ecclesiastical questions as well. It represents, in one body, all the particular churches in the Cumberland Presbyterian Church organization and constitutes one bond of union. Why is it not possible to promote the prosperity and enlargment of the church by uniting with another body that teaches a doctrine or faith identical with its own? If

these two churches, in their confessions of faith and their religious teachings, are the same, then these interests may be promoted by uniting all those who preach, teach, and believe in and care for those interests, the same as can be done by individuals joining their interests in copartnerships or corporations. United action is productive of more good than divided action under the circumstances. The general assembly has power to receive under its jurisdiction other ecclesiastical bodies of the same faith. This clause must be read with the clause that directs the taking of measures to promote and enlarge the church; and in our judgment the church is enlarged, and its prosperity made more sure, by receiving the support of a stronger sister church. If a smaller church can be received, surely affiliation and union can be made with a stronger sister church, if thereby the church, as a religious body, is prospered and enlarged." The learned judge then called attention to the fact that many such unions have been formed among the Presbyterian Church bodies upon the faith of the inherent or implied power to do so.

In 1785 the synods of New York and Philadelphia took steps for the organization of the General Assembly, with a view to the union of all the Presbyterian bodies; and in 1789 resolved such synods into a General Assembly. In 1801, after having failed in efforts to unite with both the Reformed Dutch and Associated Reformed Churches, the General Assembly so organized agreed upon a plan of union with the General Assembly of Connecticut. This action seems to have been taken upon the faith of an inherent power so to act. It was from that organization, so formed, that the founders of the Cumberland Presbyterian Church, in 1810, withdrew because of a doctrinal difference, and took such action that the organization of the Cumberland Presbyterian Church followed; and attention has already been called to the fact that the organization of the Cumberland Presbyterian Church closely followed, in its constitution, the form of government from which it withdrew. Many kindred unions have been formed in like manner, between similar bodies, not only in the United States, but in Canada as well, and upon no different authority. Among them may be mentioned the union of the Associated Reform Church with the Associate Church in 1858, forming the United Presbyterian Church; the Independent Presbyterian Church of the Caro-

linas with the General Assembly of the Presbyterian Church
(South) in 1863; the Old School Presbyterian Church with the
New School in 1870; the Alabama Presbyteries of the Associate
Reform Church with the Presbyterian Church (South) in 1867.
Ramsay, P. J., after calling attention to the historical matters
just referred to, concludes the discussion relating to the power of
the Cumberland Presbyterian Church to reunite with the North-
ern Presbyterian Church, in the following language: "The Gen-
eral Assembly of the Cumberland Presbyterian Church, when once
created, had the same implied power and authority in that church
that its kindred assembly had in the Presbyterian Church of the
United States of America. That such General Assemblies and
like bodies have an implied power to unite with others of the same
faith or teaching seems to be supported by the authorities and to
spring from the very nature of the case."

The authority of the General Assembly of the Cumberland Pres-
byterian Church is derived from the constitution. This church,
in its form of government, is like its predecessor. The form of
government is not unlike the federal form of government under
which we live. The General Assembly of the church is the high-
est legislative, executive, and judicial power of the church. It has,
in these three capacities, all of the authority that is expressly con-
ferred by the constitution, as well as that which is to be necessa-
rily implied from any of the express powers therein granted or
from the general design and purpose for which the organization
was formed. It being settled by the judgment of the General As-
sembly, as the final arbiter of the church in all such matters, that
there is no substantial difference between the teachings and doc-
trines of the two churches, the question as to whether it was expe-
dient for the two churches to unite under one name and form of
government was a matter addressed to the sound judgment of the
General Assembly of the Cumberland Presbyterian Church itself.
The very constitution contemplates union with other churches. It
is authorized to receive into its jurisdiction other ecclesiastical
bodies and organizations that conform to the doctrine and order
of the Cumberland Presbyterian Church. When this provision was
inserted in the constitution it was probably contemplated that
such organizations would generally be organizations of less power
and less strength and less numbers than the existing Cumberland

Presbyterian Church; but there is no limitation in the constitution upon the power to receive other organizations; and this power carries with it the implied power to unite with other organizations, under the same limitations under which they could receive, in their name and in their jurisdiction, similar organizations. In the judgment of the General Assembly of the Cumberland Presbyterian Church, the purpose for which it was organized is to be promoted by the reunion with the church from which it sprang. They may be mistaken in this. This reunion may thrust upon them and their associates perplexing questions, which, in times to come, may bring about disagreement and separation. But all of these matters are matters for the ecclesiastical body itself, and, when determined by it, those members of the church who are not in accord with the governing authority must either bow in submission to the powers that be, or make their alignments with other organizations with whom they can live in accord and harmony. It was argued that the constitution of the Cumberland Presbyterian Church could not be amended except by a two-thirds vote, etc. But, under the view that we have taken, no amendment is necessary to effect the reunion, and therefore it is not necessary to say more in reference to this point. The General Assembly, as the highest church court, has determined the questions arising as to the alleged differences of doctrine. The General Assembly, as the highest authority of the church, executive, legislative, and judicial, has determined that it is wise and best that the reunion should take place, and the constitution of the church, as we have interpreted it, gives that body power and jurisdiction to deal with this question, and the question of reunion has been settled in form and manner as the constitution prescribes. We see no reason whatever for the interference of the civil courts in the controversy presented in the record.

Other questions were argued in the briefs, as to the rights of sureties on the notes given by the Atlanta church to the insurance company, etc.; but the trial judge did not pass on these questions, and based his judgment solely upon the ground that the reunion of the two churches was not authorized by the constitution of the Cumberland Presbyterian Church. We have confined our discussion to the question decided by him and will determine no other at the present time. Having reached a contrary conclusion to that

reached by the able, learned, and painstaking trial judge, no other course is open to us than to reverse his judgment.

*Judgment reversed.    All the Justices concur.*