REFORMED BETHANIEN CHURCH, et al, Appellants, v.
OCHSNER, et al, Respondents

(31 N. W.2d 249.)

(File No. 8936. Opinion filed February 20, 1948.)

C. L. Morgan, of Mitchell, and H. A. Doyle and Frank Biegelmeier, both of Yankton, for Plaintiffs and Appellants.

**W. W. French,** of Yankton, and **Wicks & Quinn** of Scotland, for Defendants and Respondents.

SMITH, J. This litigation arose out of a schism in a religious society. The defendants are in possession of Lots 7, 8 and 9, Block 20, John D. Lawler's Addition to Scotland, South Dakota, and of a church building and parsonage located thereon as the representatives of the Evangelical and Reformed Church, a general federated ecclesiastical body. The plaintiffs seek to quiet title thereto in the Reformed Bethanien Church, alleged to be an independent local church. The trial resulted in a judgment for the defendants and the plaintiffs have appealed.

A brief outline of the factual background of this controversy is essential to an understanding of the issues on appeal. In 1883 a number of German residents of Scotland who were adherents of the Reformed faith organized a religious society. Title to two lots was acquired by purchase in the name of three of their number. The deed was to those individuals as "Trustees and their successors." A church and parsonage were erected thereon. The third lot is vacant and was not purchased until 1943. In 1886 they organized a religious corporation named "The Reformed Bethanien Church." In 1889 they adopted a constitution. In 1887 at a meeting held in the above described church, in which the pastor and a lay representative of its congregation participated with representatives of other congregations of the Reformed faith, the "South Dakota Classis" of the "Reformed Church of the United States" was organized. From that time forward the congregation at Scotland was served by pastors ordained by the "Reformed Church in the United States" and until 1934 it participated in the activities, and contributed its apportionment for the support of that general church. In 1934 a union was consummated between the "Reformed Church in the United States" and the "Evangelical Synod of North America" under the name of "The Evangelical and Reformed Church." In October 1940, at a meeting held in the Scotland church, representatives of that congregation and of other congregations organized the Dakota Synod of the Evangelical and Reformed Church. There-

after the congregation at Scotland continued to send its delegates and contributions to the Dakota Synod until 1944. At a meeting in 1944 the Scotland congregation resolved to withdraw from the Evangelical and Reformed Church, and subsequently it notified the Dakota Synod of the action it had taken. In June 1945 at a meeting called and attended by members of the Scotland congregation who believed a mistake had been made, a resolution was adopted to re-unite with the Evangelical and Reformed Church. There-upon such members took possession of the church building and parsonage as representatives of that ecclesiastical body. The remaining members caused this action to be instituted to quiet title to the property in the above described religious corporation, The Reformed Bethanien Church, and to ex-clude the defendants and the Evangelical and Reformed Church from the use and benefit thereof.

It was the view of the trial court that, as originally organized, the congregation or church at Scotland was an independent body, but that it shortly affiliated with and became an integral part of a general church, the Reformed Church in the United States, and eventually, through union of that body with the Evangelical Synod of North America, it became an organic part of the resulting general church, the Evangelical and Reformed Church, and consequently its property devolved to the last named general church. It was of the further view that the incorporated local congrega-tion and the individuals who withdrew from the Evangelical and Reformed Church abandoned their title and their right to the use and benefit of the described property. Accordingly its judgment quieted title to the property in the Evangelical and Reformed Church, and declared that the individual defendants were entitled to the use and benefit thereof as a congregation and as representatives of that church body.

The substantial contentions of the plaintiffs on appeal will be separately stated and considered. Hereinafter we refer to the Reformed Church in the United States as the Reformed Church, and the Evangelical and Reformed Church as the Evangelical Church.

It is said by the plaintiffs that the trial court erred in finding that the local religious unit or society became an integral or organic part of the general church, the Reformed Church. They maintain that the Scotland Congregation was organized as an incorporated independent church or congregation, as found by the trial court, and has never lost its independent status. We look at the record.

The finding that the congregation was organized as an independent unit undoubtedly was induced by the fact that the articles of incorporation of the Reformed Bethanien Church makes no mention of a connection with a superior body or general church. Although there is at least a strong possibility that this religious corporation was organized for the mere temporal purposes of the religious society or congregation (cf. State v. Hutterische Gemeinde, 46 S. D. 189 at page 203, 191 N. W. 635, at page 640; Reinke v. German Evangelical Lutheran Trinity Church, 17 S. D. 262, 96 N. W. 90, and Presbytery of Huron v. Gordon, 68 S. D. 228, 300 N. W. 33), we accept the finding that the congregation was incorporated as an independent unit, and review the evidence to ascertain whether it supports the finding that it became an organic member of the Reformed Church.

An examination of the articles of incorporation and of the statute under which the Reformed Bethanien Church was organized, § § 538 to 545, Revised Civil Code 1877, reveals no provisions restraining the corporation from subordinating itself to a superior church body. In 1877, as we have indicated, the pastor and a lay member of the Scotland congregation participated with other representatives of other congregations, at a meeting held in the Scotland church at which the South Dakota Classis of the Reformed Church was organized. Thereafter in 1889 the congregation by a unanimous vote adopted a constitution including among others the following provisions, "This Congregation, known by the name 'Reformed Bethania Congregation' in its relation to the entire Charge, shall be known as a 'German Reformed Congregation.' * * * This Reformed Congregation shall remain in association with the German Reformed Synod of the Northwest as long as this Synod subjects itself unequivocally under the royal Word of its Head, Jesus

Christ. * * * The Congregation may and will not elect a pastor who' does not stand in full communion with the Reformed Church, in accord with its doctrine and faith. Member * * * of this Congregation is he * * * who professes his faith and confession in accord with the Reformed doctrine of salvation, as summarized in the Heidelberg Catechism, and obedient submittance to this Church-order. * * * A reprehensible member shall be prosecuted in accordance with the constitution and order of the Reformed Church." The Scotland congregation and two other congregations constituted a "charge" and were served by a pastor of the "Reformed Church in the United States." The constitution provided for a "combined Consistory." In many other respects this constitution is in substantial agreement with the provisions of the constitution of the Reformed Church. For example, we mention its provision for the election of "elders" and "deacons" and their powers and duties. In no particular, so far as we have been able to discern, is it out of harmony with either the letter or spirit of the constitution of the Reformed Church in the United States. We pass on.

Among the records of the Scotland congregation received in evidence was a record book identical in character to the book in which the earliest minutes of the congregation were recorded. On the flyleaf of this book appears "Record of the Church Constitution & the Communicanden of the Scotland Gemeinde, 11/19, 1884." Following some earlier records in German script, beginning on page 29, there is pasted in a printed instrument entitled Constitution of the German Reformed Friedens Charge, Scotland, S. Dak. It is followed by many signatures. It is undoubtedly a form of constitution prescribed by the Reformed Church. There is no proof of its formal adoption at a meeting of the congregation.

From the organization of the South Dakota Classis in the Scotland church in 1877 until 1934, a period of 47 years, the evidence indicates that the Scotland congregation took a full part through duly designated delegates in the proceedings of the South Dakota Classis of the Reformed Church, and its pastors were all in full communion with that church.

Thus the evidence establishes that for forty-seven years, from 1887 to 1934, this congregation comported itself as though it had become a congregation of the Reformed Church, and that in 1889 it had unanimously adopted a constitution which indicated it was then associated with that church. "This Reformed Congregation **shall remain** in association with the German Reformed Synod of the Northwest * · * *" is the language of that constitution. The named Synod was then a judicatory of the Reformed Church. We have carefully examined the provisions of the constitution of the Reformed Church and find no provision therein for the association of a congregation on other than an organic basis. We are of the opinion that these facts and circumstances warranted an inference by the trier of the fact that the Scotland congregation affiliated with the Reformed Church.

Anticipating the foregoing holding the plaintiffs say that the Reformed Church is confederated in polity, that is to say, it is made up of independent units associated for no other purpose than for mutual counsel and guidance. The constitution of the general church refutes this contention. According to its preamble that constitution was ordained "to be its fundamental law for government, doctrine and worship" and it is declared to have binding authority on all its membership, congregations and judicatories. It provides for a membership in one church assembled in congregations, and subject to superior judicatories, named in ascending order as The Consistory, The Spiritual Council, The Classis, The Synod, and the General Synod. Some measure of ultimate judicial and legislative power is vested in these judicatories. These are characteristics of a federated church. Watson v. Jones, 13 Wall 679, 20 L. Ed. 666; Presbytery of Huron v. Gordon, supra; Barkley et al. v. Hayes et al., D. C., 208 F. 319; Presbytery of Bismarck v. Allen, 74 N. D. 400, 22 N. W.2d 625.

In connection with our consideration of the question of whether the Reformed Church is federated in polity we found the following of interest. A history of the Reformed Church in the United States received in evidence states, "The Reformed Church in the United States was formerly

known as 'The German Reformed Church in the United States' * * * The German Reformed Church was established in this country by the German and Swiss pioneers who came to Pennsylvania and other colonies in the first decade of the 18th century." It is recited in the court's opinion in Sutter et al., v. Trustees of First Reformed Dutch Church, 42 Pa. 503, at page 506, that the congregation there under consideration wrote in its records under date December 18, 1811, that there was no important difference between the Presbyterian form of government and that of the Reformed Dutch Church which had been adopted by the German Reformed Churches in this country.

The evidence persuades us that the Reformed Church is a federated body, and that the trial court was justified in finding that the Reformed Bethanien Church became an organic member thereof, and as we have indicated, it follows we are also persuaded that the local congregation had ceased to be an independant congregation or church. In connection with this issue we have not failed to note that in the proceedings looking toward the union of churches we have described, the highest judicatory of the Reformed Church predicated its action upon the assumption that the church was federated in character, and effected the union through the action of the judicatories, as distinguished from the action of the congregations and members.

The further contention is advanced that the property is impressed with an express trust and that the use by the defendants, as representatives of the Evangelical Church, constitutes a diversion of the property from the purpose to which it was so limited. This contention is predicated on two provisions of the constitution unanimously adopted by the congregation in 1889. That instrument provided, "The public teaching and sermonizing in this Congregation shall stand in the armor of the salvation-truth of the Reformed Church in all lands, and shall remain scripturally Reformed as long as two members stand by this doctrine and continue the name Reformed. Another doctrine shall find no entrance" and further provided, "Confession and expression of the faith of this Congregation is the Heidelberg

Catechism, which, and no other book of doctrine, shall be taught in church and school in the German language as long as the Congregation exists." To deal with this contention, it becomes necessary to determine the status of the property in question at the time of the adoption of these constitutional provisions.

It will be recalled that this property was acquired in 1883. It was acquired by purchase. The deed named "Nicholas Youngman, C. Berly and Paul Landmann Trustees and their successors" as the grantees. Although this conveyance makes no reference to a religious society, the parties seem to agree that title was conveyed to these men for the use and benefit of the then unincorporated religious society as contemplated by Ch. 49, Revised Political Code 1877, which provision has been re-enacted as SDC 11.1503. In view of the use of the premises by the congregation and the extreme lapse of time, we are of the opinion it would be proper to presume a conveyance by these trustees to the religious corporation organized in April 1886. 45 Am. Jur. 760, § 48. However, whether title passed to the religious corporation, or was held by the original trustees for its benefit as the legitimate successor of the original society, we are of the opinion that from the moment of the merger of that incorporated congregation with the Reformed Church in the United States, the described property was held for the benefit of the general church.

It is settled in this jurisdiction that a congregation of a federated church, whether incorporated or not, is but a member thereof, and holds all of its property, the title to which is not expressly limited to other uses for the use and benefit of the general church. Presbytery of Huron v. Gordon, 68 S. D. 228, 330 N. W. 33. In so holding we quoted with approval from Barkley et al. v. Hayes et al., D. C., 208 F. 319, 322, as follows:

"In this church the religious congregation or ecclesiastical body holding the property is but a subordinate member of the general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control, more or less complete, in some supreme

judicatory over the whole membership of that general organization. The local congregation is itself but a member of a much larger and more important religious organization, is under its government and control, and is bound by its orders and judgments. Therefore, when the property held by the church is that purchased or conveyed for the general use of the religious congregation, not devoted forever by the instrument which conveyed it nor by any specific declaration of its owner to the support of any special religious dogmas, or any peculiar form of worship, it is and remains the property of the general church which exercises such general and ultimate power of control. It does not belong to the particular congregation which uses it, much less to the individual members of such a congregation. It does not belong to the presbytery or the synod, nor, in a strict sense, to the general assembly. It belongs to the church which is composed of its entire membership; that membership being governed and controlled by the organic law of the church, the administration of which is lodged in certain judicatories arising, in regular succession, to the general assembly or court of last resort, embracing in itself legislative, administrative, and judicial powers. The government of the Presbyterian Church is republican and representative in character. Its administration is vested, not in the individual members, not in the congregations, but in the general assembly and the presbyteries; and the church as a whole, acting through its supreme governing bodies, exercises the ultimate rights of ownership and control over all its properties."

██ In the cited case we were dealing with property acquired by the local unit as a member of the general church. We perceive no reason for arriving at a different conclusion with reference to property held by the local unit prior to its affiliation. In the absence of a specific understanding or agreement preserving a separate identity and expressing an intention to withhold its property, we think it must be presumed that by voluntarily merging itself as an organ of the larger body, it intended to dedicate its all to the purposes of that body. Such existence as it has had since this fusion is as but a part or member of a whole,

and that which is held by or for it is held by or for the whole.

■ Thus it is made to appear that at the time in 1889 of the adoption of the provisions of the constitution which plaintiffs contend impressed this property with an express trust, the property was not held as the separate property of the congregation for the use of its members, but was held for the use and benefit of the general church as a whole. No provision of the constitution of the Reformed Church has been called to our attention empowering a local unit to impress church property with an express trust. In the absence of such a constitutional provision, or of any character of special authorization, we are of the opinion that the local body was without power to produce such a result.

■ Moreover, we are of the opinion that no such result was intended by the Scotland congregation. We place the provisions urged upon us by plaintiffs in their contexts as paragraphs of a chapter of the 1889 constitution entitled "The Church Congregation." The chapter reads as follows:

"1. The Church-congregation (communion) is not a dead, locally limited objective, subject to the care, leadership, and regency of a consecrated priest. Such does not exist by virtue of the Scriptures.

"The Christian Church-communion is, according to Scripture, a communion of living, Christ Jesus confessing, faithful and openly witnessing, and equally entitled members of the communion of saints. It has, by the word of its Lord and Master, Jesus Christ, equal rights with the Church Catholica.

"2. This Congregation, known by the name 'Reformed Bethania Congregation' in its relation to the entire Charge, shall be known as a 'German Reformed Congregation.'

"3. The purpose of this Congregation is, to edify the members in their most holy faith upon the foundation of the Word of God, the Apostles and Prophets, by the proclamation of the Word of God and the Sacraments, unto the glory of their Head, Jesus Christ.

"4. Confession and expression of the faith of this Congregation is the Heidelberg Catechism, which, and no other

book of doctrine, shall be taught in church and school in the German language as long as the Congregation exists.

"5. The public worship in this congregation shall be conducted in the German language, without a so-called priest-like liturgy, in reasonable, vivifying, and God-pleasing manner.

"6. The public teaching and sermonizing in this Congregation shall stand in the armor of the salvation-truth of the Reformed Church in all lands, and shall remain scripturally Reformed as long as two members stand by this doctrine and continue the name Reformed. Another doctrine shall find no entrance.

"7. This Reformed Congregation shall remain in association with the German Reformed Synod of the Northwest as long as this Synod subjects itself unequivocally under the royal Word of its Head, Jesus Christ.

"8. The annual meeting of this Congregation shall take place after the turn of the new year, the Monday following the first Sunday when the pastor services same, and shall be presided over by him. Special meetings may be called during the year as circumstances warrant."

These provisions but declare the faith and doctrine and duties of the congregation, and identify it as a congregation of the Northwest Synod, a subordinate body of the Reformed Church. The faith and doctrine so declared is not a separate faith of this local congregation; it is the faith and doctrine upon which the ministry of the Reformed Church as a whole is based. Property is not mentioned. The property of the church was devoted to these purposes by the action of the general church as a whole. It seems plain to us that these provisions were only intended as a declaration of faith and doctrine and as assurance to, and a covenant with, the Reformed Church of the continuing adherence of the local congregation to the confession of that church.

█ The next proposition presented for consideration was argued in connection with the contention that the use of this property by the defendants as representatives of the Evangelical Church constitutes an unlawful diversion of that property from the purposes to which it has been dedicated.

The direct argument, being predicated on the theory of an express trust, is answered by our determination that the asserted express trust is nonexistent. However, in the presentation of the case as a whole, there is an undercurrent of contention that the difference in faith and doctrine of the Reformed Church and the Evangelical Church is so substantial as to constitute the use of the property in question by the defendants in preaching the faith and doctrine of the last named church a diversion of the property from the purposes to which it had been impliedly devoted by those who organized the church. The rights of a minority in case of an abandonment of the faith and doctrine of the church are stated in Mack v. Kime, 129 Ga. 1, 58 S. E. 184, 193, 24 L. R. A., N. S., 675. It was there written:

"The principle at the foundation of all of these rulings, * * * is that property which is devoted to the purposes of a given religious organization must be used for the purpose to which it is devoted, and that where the controlling authority of the organization (whether it be a majority of the congregation of those churches having a congregational form of government or the highest court of a church in those churches which have different tribunals, with appeals from one to the other) engages in a palpable attempt to divert the property to a purpose utterly variant from that to which it was originally devoted, the civil courts will interfere, even at the instance of a minorty, in cases where the form of church government is congregational, or at the instance of the dissenters, without regard to number, where the form of government is other than congregational, and protect them in their property rights against those who, without authority, are attempting to carry the property along lines that are utterly variant from the purpose for which the organization was formed."

In developing their point that the difference in the faith and doctrine is substantial, our attention is directed to the respective declarations of these churches. The constitution of the Reformed Church provides as follows:

"The Holy Scriptures of the Old and New Testaments, which are called canonical, being recognized as genuine and

inspired, are received as the true and proper Word of God, and the ultimate measure of the whole Christian faith and doctrine."

And further provides:

"The Heidelberg Catechism is received as an authoritative expression of the truths taught in the Holy Scriptures, and is acknowledged to be the standard of doctrine in the Reformed Church in the United States."

The constitution of the Evangelical and Reformed Church provides:

"The Holy Scriptures of the Old and New Testaments are recognized as the Word of God and the ultimate rule of Christian faith and practice.

"The doctrinal standards of the Evangelical and Reformed Church are the Heidelberg Catechism, Luther's Catechism and the Augsburg Confession. They are accepted as an authoritative interpretation of the essential truth taught in the Holy Scriptures.

"Whenever these doctrinal standards differ, ministers, memers and congregations, in accordance with the liberty of conscience inherent in the gospel, are allowed to adhere to the interpretation of one of these confessions. However, in each case the final norm is the Word of God."

These standards of interpretation of the gospel were not placed in the records. Ministers of long experience in the Reformed Church in the United States, who were members and officers of the Evangelical and Reformed Church from the time of the union until this schism developed in 1944, express their opinion as to some of the differences in these standards which the dissentient parties looked upon as crucial. It is said that to open the doors of the church edifice to the teachings and preaching of those who, if their conscience so directs, are free to use the Augsburg Confession or Luther's Catechism rather than the Heidleberg Catechism as their standard of interpretation of the Scriptures, amounts to a perversion of the sacred implied trust under which the property is held.

The contention confronts us with an ecclesiastical issue. To "take cognizance" of ecclesiastical questions is the func-

tion of the judicatories of the Reformed Church in the United States, according to the express words of its constitution. We think these ecclesiastical tribunals were required to decide this precise issue in connection with the consummation of the union of that church with the Evangelical Synod of North America; that their decision was adverse to plaintiffs' contention; and that we are warranted in accepting that decision as binding upon the parties.

 The courts have generally accepted the principle that the power of a church to unite with another church, absent some restrictive provision in its organic law, is inherent. Mack v. Kime, supra; Ramsey v. Hicks, 174 Ind. 428, 91 N. E. 344, 30 L. R. A., N. S., 665; Commonwealth v. Stauffer, 289 Pa. 139, 137 A. 179; and Barkley et al. v. Hayes et. al., supra. If two such bodies are in complete agreement in their confession of faith and in doctrine, to unite is but to further a prime purpose of both churches by broadening their influence and ministry. The power of the judicatories of a federated church to effect a union with another body is drawn in question when some change in confession of faith and declaration of doctrine is involved. It is made plain in Ramsey v. Hicks, supra, that the power of such judicatories to effect the proposed union turns upon their power to amend the confession of faith and doctrine of their church. In other words, if they have power to so amend the statement of faith and doctrine of their church as to bring it into complete harmony with the proposed confessions of the united church, and then to effect a union, they have power to effect a union which involves such an amended declaration of doctrine.

The constitution of the Reformed Church clothed the General Synod with power by a two-thirds vote, with the concurrence of two-thirds of the Classis, to amend its declaration of faith and doctrine. "The Plan of Union" was adopted by a two-thirds vote of the General Synod, concurred in by two-thirds of the Classis. Implicit in that action is a determination by those ecclesiastical, tribunals that adoption of the proposed composite confessions of faith and doctrine was within their competency. The nature of their

decision is obvious. They concluded that no radical or substantial change was involved. "The Plan of Union" which they adopted included a preamble reading as follows: "The Reformed Church in the United States and the Evangelical Synod of North America, under the conviction that they are in agreement on the essential doctrines of the Christian faith and on the ideals of the Christian life as contained in the Old and New Testaments and as defined in their respective standards of doctrine, do hereby declare their desire to be united in one body according to articles mutually agreed upon as follows:" and further embraced an article reading "We acknowledge and accept the historical confessions of the two churches as the doctrinal basis of union."

In dealing with such an ecclesiastical decision by a church tribunal the Supreme Court of the United States in the case of Watson v. Jones, 13 Wall 679, 20 L. Ed. 666, wrote as follows:

"In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom or law have been decided by the highest these church judicatories to which the matter has been carried, legal tribunals must accept such decisions as final, and as binding on them in their application of the case before them."

And further wrote:

"* * * It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject to such appeals as the organism itself provides for."

We think it doubtful whether the Supreme Court intended to announce a principle without limitation or exception. It seems probable that when the occasion arises it will align itself with the courts which have limited the application of its announced principle. See 24 L. R. A., N. S., 698.

In Griggs v. Middaugh et al., 10 Ohio Dec. 643, it was written: "Civil courts may as this court apprehends the law, look into and determine the question whether there has been, by the action of such body, a substantial and evident departure in essential matters of faith; since such action would affect the title to the property held by the church for its uses. But such departure must be from essential faith and must be obvious—not reasonably open to controversy."

The principle has been clearly and fully formulated by the Supreme Court of Georgia in Mack v. Kime, supra, in words as follows:

"But in all cases of this character it must appear that the governing authorities of the church have abandoned the tenets and doctrines of the original organization. Whether they have so abandoned them is an ecclesiastical question; and if, under the form of government of the church, there is a tribunal of any character erected for the decision of these questions, the civil courts will not undertake to revise or review the judgment of this tribunal, provided the question is of such a character that it would admit of dispute, and would therefore be proper for decision by the ecclesiastical tribunal. So long as the case rests upon debatable ground, as to whether there has been an abandonment of the purpose of the original organization, the courts will allow the judgment of the church tribunal to stand without question; but where, in a given case, the facts are such that there can be no question that there has been a complete abandonment, and as a result the property will be diverted to purposes never contemplated by the original organization, the civil courts will interfere at the instance of those who adhere to the teachings of the original association."

These principles have governed our review of the record and our consideration of the argument of counsel. We are not convinced from this record that men may not reasonably differ on the question whether in essence the composite confession of the Evangelical and Reformed Church is substantially or radically at variance with the confession of the Reformed Church in the United States. It follows we are

of the opinion that the trial court did not err in accepting the decisions of the judicatories of the Reformed Church on this ecclesiastical issue as binding on it in adjudicating the property rights of the parties.

 The remaining contention is that the defendants are depriving plaintiffs of their constitutional right to worship God according to the dictates of conscience. In Gordon v. Presbytery of Huron, supra, we disposed of that contention in the following words [68 S. D. 228, 300 N. W. 36]: "The contention that the judgment below is in derogation of the constitutional liberties does not restrict them in the exercise of their sacred constitutional rights. They remain free to follow the dictates of conscience and to associate themselves in any faith or form of worship they may choose. In changing their adherence from the Church we have identified, however, they may not take its property with them, even though their bounty may have been contributed to its purchase." The contention is untenable.

Our holding is that the judgment below is not vulnerable to attack on the grounds urged by plaintiffs. The judgment of the trial court is affirmed.

ROBERTS, P. J., and RUDOLPH and HAYES, JJ., concur.

SICKEL, Judge (dissenting). The sole question in this case is whether the use of the church property by members of the Evangelical Church constituted a diversion of the property from the purpose for which it was acquired by the Reformed Church. I concur in that part of the opinion which decides that this is an ecclesiastical, not a judicial, question, and it is therefore my opinion that the action should have been dismissed on its merits.