24366. PRESBYTERIAN CHURCH IN THE UNITED
STATES et al. v. EASTERN HEIGHTS
PRESBYTERIAN CHURCH.
24367. PRESBYTERIAN CHURCH IN THE UNITED
STATES et al. v. MARY ELIZABETH BLUE HULL
MEMORIAL PRESBYTERIAN CHURCH.

ARGUED NOVEMBER 13, 1967—DECIDED JANUARY 18, 1968—
REHEARING DENIED FEBRUARY 12, 1968.

*Frank S. Cheatham, Jr.,* for appellants.

*Owen H. Page, Richard T. Cowan, Frank B. Zeigler,* for appellees.

GRICE, Justice. The issue here is whether two local Presby-

terian churches, in withdrawing from the general organization, are entitled to the local church properties. It stems from claims by the local churches that the general church has abandoned the fundamental tenets of faith and practice existing when the local churches affiliated with it.

This litigation began on May 26, 1966, when Mary Elizabeth Blue Hull Memorial Presbyterian Church and Eastern Heights Presbyterian Church, incorporated nonprofit religious institutions located in Savannah, filed in the Superior Court of Chatham County petitions against the Presbyterian Church in the United States (herein referred to as "the general church") and the named chairman of the Administrative Commission of its Presbytery of Savannah. Each of the petitions sought injunctive relief against the general church organization interfering with the local churches' exclusive use and control of the local church properties. The defendants denied the material allegations of the petitions and sought affirmative equitable relief.

The two cases were tried together, resulting in verdicts and judgments in favor of the local churches.

The enumerations of error complain of the trial court's denial of motions to dismiss the petitions, for nonsuit and for directed verdict, the admission of certain evidence, and also one portion of the charge to the jury.

The allegations of the petition of Eastern Heights and its trustees, insofar as necessary to recite here, are those which follow.

The congregation, on April 17, 1966, adopted a resolution, a copy of which was transmitted to the general church and its Savannah Presbytery. This resolution affirmed the congregation's religious faith and beliefs as originally adopted by the general church in 1861, declared that the general church had violated its constitution and departed from the faith and practice existing when Eastern Heights affiliated with it, and declared that Eastern Heights severed all connection with the general church and was henceforth an autonomous Presbyterian church. This resolution recited that the violations and departures of the general church from its original tenets of faith and practice included the following: ordaining of women as minis-

ters and ruling elders, making pronouncements and recommendations concerning civil, economic, social and political matters, giving support to the removal of Bible reading and prayers by children in the public schools, adopting certain Sunday School literature and teaching neo-orthodoxy alien to the Confession of Faith and Catechisms, as originally adopted by the general church, and causing all members to remain in the National Council of Churches of Christ and willingly accepting its leadership which advocated named practices, such as the subverting of parental authority, civil disobedience and intermeddling in civil affairs.

The petition alleged that the general church has also made pronouncements in matters involving international issues such as the Vietnam conflict and has disseminated publications denying the Holy Trinity and violating the moral and ethical standards of the faith.

It averred that all of the foregoing constitute a substantial, fundamental and radical departure from the faith and practice of the general church and have occurred since the affiliation of Eastern Heights with it in 1930.

The petition further recites that on May 19, 1966, an Administrative Commission of the general church's Presbytery of Savannah took certain action by a resolution which, in material part, recited as follows: The Presbytery had received letters from the named ministers of Eastern Heights and Hull Memorial in which each renounced the jurisdiction or authority over him of the general church and its Savannah Presbytery; that each had thus removed himself from office and membership in the general church and was no longer entitled to perform with ordained authority any act in it; that by the resolutions of Eastern Heights and Hull Memorial of April 17, 1966, all elders of both churches, except one not contacted and another who dissented, had removed themselves from office and membership in the general church; that they no longer had any authority to exercise office derived from the general church; that since there was but one ruling elder in each of the two churches and one ruling elder does not constitute a Session so as to exercise jurisdiction over the two local churches, the Commission "will secure

Ministerial leadership and provide regular services of worship in the sanctuaries of [the two churches] for those members who wish to continue their membership in and communion with [the general church], and will take such further action as shall be necessary in accordance with the Constitution of [the general church]."

The petition also averred that by such Administrative Commission action, the defendants threaten to trespass upon the property of Eastern Heights by assuming original jurisdiction over it, denying it the right to exercise authority over its affairs and imposing other ministerial leadership upon it for the purposes of holding regular worship services; that the removal of the regular minister and the imposition of another would disrupt the good order and peace of its worship services; that the threatened acts of trespass would destroy the quiet and peaceful possession it now enjoys and would have a demoralizing effect upon it; that unless the threatened trespass is enjoined Eastern Heights will be irreparably damaged, the peaceful utility and enjoyment of its property will be adversely affected, and the dignity and sanctity of the church edifice will be intruded upon.

The plaintiffs declare that they are seeking to protect their faith and avoid one in conflict with that in existence when they affiliated with the general church, and that they should have title to the church property quieted and confirmed in them to preserve the trust. They allege that Eastern Heights is vested with title and ownership and now enjoys quiet and peaceful possession of described real property, conveyed to it or to trustees of it.

The prayers of the petition were for temporary and permanent injunction against the threatened acts of trespass hereinabove described and other relief.

The allegations of the petition of Hull Memorial are similar in substance to those of Eastern Heights. Those necessary to recite are as follows: that it owns described real estate, one portion of which was acquired in 1914 by deed reciting that it was to be used for a place of worship by a church of the Presbyterian denomination known as the Mary Elizabeth Blue Hull Memorial Presbyterian Church; that it became affiliated with the

general church in 1890; that no moneys have ever been contributed to it by the general church or by its Savannah Presbytery; that since it acquired its property the general church has made stated revolutionary, fundamental, unlawful, and radical diversion from the Presbyterian faith; and that in order to remain true to the Presbyterian doctrines and practices in force when it affiliated with the general church and acquired its property, it withdrew from the general church on April 17, 1966. The petition prayed for the same relief sought by Eastern Heights and in addition asked that title to the local church property be adjudged in it.

To each of these petitions the defendants interposed similar answers and cross bills which denied the material allegations. They made allegations which, insofar as necessary to relate here, follow. Prior to the adoption of their withdrawal resolutions the members and ruling elders of Eastern Heights and Hull Memorial were members of the general church, which is representative in form, and were subject to its constitution and laws. Because of such withdrawal by the two local churches the Administrative Commission took the action recounted in its resolution of May 19, 1966, referred to above. Its decision was with full authority of the Savannah Presbytery, was made known to the plaintiffs, but was not appealed from and therefore became final and binding on the parties and the court. The defendants have a right of possession to the properties but the plaintiffs have appropriated them to the use of the two local churches, in violation of law and the rules of the church. This constitutes a continuing trespass which must be enjoined or the defendants will be irreparably injured, and the peace and dignity of their right of possession of the properties for religious worship for those loyal to the general church will be impaired. Each answer and cross action prayed, among other matters, for injunctive relief against the local churches' appropriation of the local properties and for decree that the Savannah Presbytery of the general church has an implied trust over such properties as the rightful representative of the general church for the use and benefit of those members adhering to the doctrines and regulations of the general church.

Upon the trial the evidence took a broad range, both oral and documentary. The highlights of the history of the Presbyterian denomination were recited by theologians. They traced the beginning more than four hundred years ago, the spread of the movement to the American colonies in the eighteenth century, the establishment of the Presbyterian Church in the United States of America, the withdrawal from it in 1861 by churches in the southern portion of the United States, and the organization in Augusta, Georgia, of the defendant Presbyterian Church in the United States, sometimes referred to as "The Southern Presbyterian Church." They enumerated the bases of faith and practice of this organization when formed in 1861 as the Old and New Testaments of the Holy Bible, the Westminster Confession of Faith, and the Larger and Shorter Catechisms.

They stated that the constitution of the general church is composed of such Confession of Faith, the two Catechisms, the Book of Church Order, and the Directory of Worship. They explained that the government of the general church is representative or connective, and not congregational. They recited that the structure of this government, in ascending order, is as follows: the Session of each local church which is made up of its ruling elders; the Presbytery which is constituted of several Sessions in a geographical area; the Synod which is ordinarily composed of the Presbyteries within a state; and the General Assembly which is formed by representatives from the entire organization. They related that these Sessions, Presbyteries, Synods, and the General Assembly also constitute the judicial system of the church organization.

The evidence was that the constitution of the general church contains no provision governing the situation here. There was considerable testimony as to whether the general church had over the years in various controversies recognized local ownership of church property. It was shown that the only provision in its constitution for a Presbytery to take local church property was when the congregation no longer existed.

Local witnesses recounted the origin and development of the two local churches.

Eastern Heights began as a mission of the Independent Pres-

byterian Church of Savannah. It was incorporated on December 6, 1930, and on the following day was commissioned by the Savannah Presbytery of the general church. At that time the Independent Church conveyed to Eastern Heights property to be used as a chapel, this deed naming as grantee "Eastern Heights Presbyterian Church, a religious corporation." Later two other tracts were acquired by it, each deed naming as grantees certain persons as "Trustees of the Eastern Heights Presbyterian Church, and their successors in office." One of these deeds provided that the property was to be held in trust "for the use and benefit of the congregation of the Eastern Heights Presbyterian Church." At no time has the general church made any gift or loan to Eastern Heights.

Hull Memorial was organized as an independent Presbyterian church and became affiliated with the general church in 1890. A portion of the property now in question was acquired in 1914; the deed named the Mary Elizabeth Blue Hull Memorial Presbyterian Church as grantee and recited that the property was to be used as and for a place of worship by a church of the Presbyterian denomination known as that named grantee. Later other property was acquired by it and these later deeds also named the Hull Memorial Church itself as grantee. Neither the general church nor its Savannah Presbytery has contributed any money to the purchase, buildings, operations, or maintenance of Hull Memorial.

Many documents were introduced in evidence. These included deeds, the withdrawal resolutions of the two local churches and the resolution showing the actions of the Administrative Commission above referred to.

Other documents pertained to the faith and practice of the general church when Eastern Heights and Hull Memorial affiliated with it and acquired the properties now in question. Many of these relate to actions which the two local churches cite as abandonment by the general church of its original tenets of faith and practice. These documents will be referred to later in this opinion.

From the foregoing facts, we regard the controlling question to be this: Are local Presbyterian churches which withdraw from

the general church, charging abandonment by the general church of the tenets of faith and practice existing when the local churches affiliated with it, entitled to maintain an action in the civil courts for the possession and use of the local church properties, legal title to which is in the local churches?

■ The appellants strongly urge that the petitions raise ecclesiastical questions which are exclusively within the jurisdiction of the church, not of the civil courts, and therefore that the plaintiffs cannot maintain this action.

In considering this contention we are mindful that "The traditional American doctrine of freedom of religion and separation of church and state carries with it freedom of the church from having its doctrines or beliefs defined, interpreted, or censored by civil courts." *Sapp v. Callaway*, 208 Ga. 805, 810-811 (69 SE2d 734).

But, at the same time, we also keep in mind that when property rights are involved civil courts will, in a proper case, protect them against wrongful diversion. Our *Code*, § 22-408, provides: "Courts are reluctant to interpose in questions affecting the management of the temporalities of a church; but when property is devoted to a specific doctrine or purpose, the courts will prevent it from being diverted from the trust."

In this country the authorities are virtually unanimous in holding that because of the connective governmental structure of the Presbyterian Church, there is an implied trust upon the local church properties for the benefit of the general church. See in this connection, Watson v. Jones, 80 U. S. (13 Wall.) 679 (20 LE 666); St. John's Presbytery v. Central Presbyterian Church of St. Petersburg, (Fla.) 102 S2d 714, 717; Presbytery of the Everglades v. Morgan, (Fla.) 125 S2d 762. Furthermore, in the trial of the present cases the court charged the jury that the local church properties in question were subject to an implied trust in favor of the general church, and no cross appeal was taken on this portion of the charge by the local churches. We take the view that such a trust is conditioned upon the general church's adherence to its tenets of faith and practice existing when the local church affiliated with it and that an abandonment of, or departure from, such tenets is a diversion from the trust, which the civil courts will prevent.

This court in *Mack v. Kime,* 129 Ga. 1 (2) (58 SE 184, 24 LRA (NS) 675), held: "The general rule is that where property rights are involved, the civil courts will interfere to protect the members of an ecclesiastical organization who adhere to the tenets and doctrines which the organization was organized to promulgate, and protect them in the right to use the property, as against those members of the organization who are attempting to divert the same to purposes utterly foreign. . ." See also, *Tucker v. Paulk,* 148 Ga. 228 (3) (96 SE 339), where this court approved the trial court's finding on whether the plaintiffs had "departed from the organization and doctrine of the church."

A different result is not required because of the rule that "Generally, the civil courts will look to the decisions of the constituted tribunals of a church in determining whether or not there may have been an abandonment of the faith, doctrines, practices, and decorum of a church." *Sapp v. Callaway,* 210 Ga. 277 (79 SE2d 532). Also, see *Mack v. Kime,* 129 Ga. 1, supra. Here, the Administrative Commission appointed by the Savannah Presbytery made no decision as to whether the general church had abandoned its original tenets of faith and practice. Furthermore, the local churches were not required to seek an adjudication of such issue within the framework of the general church because the diversions complained of had already occurred and the local churches had withdrawn and severed their connection with it.

The local churches charge abandonment of, or departure from, original tenets of faith and practice by the general church, and hence the civil courts will entertain the action.

■ Appellants contend that even if the civil courts will determine the question of abandonment of, or departure from, original tenets, the local churches must, under *Mack v. Kime,* 129 Ga. 1, supra, show absolute or complete abandonment in order to obtain relief.

The *Mack* case, in discussing the degree of abandonment or departure necessary to obtain protection, uses terminology such as "complete abandonment," "purposes utterly foreign," "entirely abandon," "utterly abandon," and "abandon altogether." We disagree. We do not believe that "complete" or like degree

of abandonment or departure is necessary for relief. To the extent that *Mack v. Kime*, 129 Ga. 1, supra, requires such standard, it is expressly overruled.

The degree of abandonment or departure necessary to be shown to obtain protection in civil courts is that emphasized in the case at bar by the trial judge—substantial abandonment. "Substantial" is synonymous with "fundamental," "material," "vital," and "important," and is in keeping with the standard which is recognized in the following treatise statement: "No denomination, however, can exercise its share of control over a local congregation so as to require the property of the latter to be used for propagation of doctrines in conflict with the fundamental teachings of the denomination as accepted at the time the local congregation united with the denomination. The unlawful change of the constitution and confession of faith by the superior judicatory does not authorize a new use of its property by the individual church. In such case those who adhere to the original constitution and confession of faith are entitled to the use of the property." 76 CJS 849, Religious Societies, § 70. See also, 45 AmJur 771, Religious Societies, § 61; Annots., 24 LRA (NS) 692, 8 ALR 105, 70 ALR 75.

To condition relief upon *complete* abandonment would impose upon the local churches the burden of showing that the general church had rejected each and every tenet of faith and practice existing when the local churches affiliated with it. For instance, suppose that this general church declared that it had abandoned as part of its tenets of faith and practice the entire New Testament. With that abandonment would go the existence of Jesus Christ, and the accounts of His birth, ministry, crucifixion, resurrection, and ascension into heaven. That would not be a "complete" abandonment of all the original tenets of faith and practice of that church. Yet even with the Old Testament, with all of its value, remaining, this would be an entirely different theology.

Therefore, we hold that upon a showing of substantial abandonment of, or departure from, the original tenets of faith and practice by the general church, the civil courts will afford protection to the local churches as to possession and use of the local church properties, free of any claim by the general church.

It is significant that here the issue is between the local churches and the general church, not between two factions of a local church, as governed by *Code* § 22-406, which in material part provides that ". . . The withdrawal by one part of a congregation from the original body . . . is a relinquishment of all rights in the church abandoned." In this connection, we are familiar with some statements to the effect that the members of the local church who withdraw from the general church are not entitled to the property. See 45 AmJur 778, Religious Societies, § 68; 76 CJS 850, Religious Societies, § 71; St. John's Presbytery v. Central Presbyterian Church of St. Petersburg, (Fla.) 102 S2d 714, supra, and citations. However, we know of no decision involving an issue between a local church and its general church, where a substantial abandonment of, or departure from, the original tenets of faith and practice by the general church is shown, which holds that in such situation the local church is not entitled to the use of its property. The cases relied upon by the appellants are thus distinguishable.

■ This brings us to the evidence and an evaluation of it in the light of the requirement of *substantial* abandonment or departure.

The first of the actions cited by the two local churches is the declaration of the 1961 General Assembly of the general church that the doctrine of foreordination, as stated in the Confession of Faith, is not essential to Reformed theology. This, the local churches contend, violates the Westminster Confession of Faith and the Larger and Shorter Catechisms in stated particulars.

Likewise claimed as departure from original tenets of faith and practice is the position taken by the General Assembly in 1965 in refusing to endorse a proposal by a Presbytery to seek constitutional permission for voluntary Bible reading and prayer in the public schools.

Another contended departure related to involvement, through the National Council of Churches for Christ, in the Mississippi Delta Project, a civil rights movement sponsored by several organizations.

Complaint is also made of the action taken by the 1963 General Assembly authorizing the ordination of women as ministers

and ruling elders. This, the local churches claim, violates designated portions of the Scriptures and the Book of Church Order.

Several actions taken by this highest authority of the general church are urged to have been improper involvements in civil affairs, constituting an abandonment of original faith and practice.

One of the involvements thus complained of was a 1966 pronouncement on the Vietnam conflict. This pronouncement approved the policy statement which the National Council of Churches for Christ had announced in 1965. That statement, after expressing sentiments upon the situation, concluded with the recommendation that the United States: "Continue to reaffirm and manifest its readiness for unconditional discussion and negotiation in such manner as will remove any uncertainty about official policy relating to the termination of military action. Such reaffirmation might be strategically expressed by the cessation of all bombing of North Vietnam for a sufficient period to create more favorable circumstances for negotiations to begin and with a simultaneous effort to induce the North Vietnam government to stop sending military personnel and material into South Vietnam."

Another involvement in civil affairs complained of was endorsement by the General Assembly of the civil rights movement.

One of the strongest objections by the two local churches is directed at the position of the general church on the subject of civil disobedience. Advocacy of this, insofar as the evidence shows, began in the spring of 1964.

The material for Sunday School teachers in "The Earnest Worker" for that period included a presentation entitled "The Rightful Claims of Government." After stressing obligations to both government and God, it declared that "these are times when the civil authority (or church authority, for that matter) must be disobeyed . . ." and stated that whether or not peace and quiet should be maintained in a community where there is injustice is a matter for each person to decide with his own conscience and what he believes will be pleasing to God.

The Sunday School Quarterly for Older Youth, the approximate age group of 12 to 15, for May 24, 1964, contained a statement on civil disobedience, which is quoted here in full:

"Civil Disobedience. We are making history in our country and as Christians we should be awake to that fact. The problems created by segregation or integration are not new; they are as old as the human race. In our country the problem is not new, either, but in these past years we are all witnessing a new approach to that problem. For a century many have felt that the problem would solve itself as time went on; but we know now that hardly anything in human relations gets solved all by itself. About some sickness in the body, or a broken leg, we rightly say: be patient and let nature take its course. But with human problems one can hardly say that; human nature is not dependable, and is quite as likely to go the wrong way as the right way. In fact, the Bible keeps on drumming away at the idea that it is more likely to go that wrong way than the right way. That is the first point we should make today: that good causes must be helped along, and we Christians must not walk away from them.

"During the centuries people have used various methods of trying to get their problems solved: revolution, insurrection, immigration, strikes, shutdowns, sit-ins, picket lines. Each of these has had varied success in achieving results that were looked for. The phrase *civil disobedience* is something Gandhi has brought into our English language, and he says he got the idea from Jesus and the Sermon on the Mount. Today's reference to Luke 20 is of importance here. Jesus tells his questioner to give to Caesar the things that are Caesar's, but to God the things that are God's. This not only means that I pay my legitimate taxes to Caesar, and go to church on Sunday and put something into the offering plate for God. It is not quite as simple as that. It may also mean that I *withhold* from Caesar what Caesar thinks is his, but what really belongs to God!

"The disciples ignored established customs when they walked through the cornfields, plucked some corn and ate it; this was threshing in the judgment of the scribes, and was prohibited. Jesus violated the code of the Pharisees when He healed people on the Sabbath for the law at that time prohibited this. To help a sick man takes priority over the Sabbath laws; a moral law takes precedence over a civil law. You do not start a

revolution; you do not bring in tanks and set machine guns up in front of the mayor's residence to shoot him when he comes out. You quietly make your protest known, persistently you make it known. When asked about it you give your morally justifiable reasons for doing what you do. You appeal to God and his righteousness rather than to the laws of the land. And you keep at it until the laws of the land are changed to conform to what you believe is right. And if the law says you may not picket or gather peaceably for purposes of protest, then you violate the law, appealing to a higher law to justify your actions. And, of course, you take the consequences.

"Taking the Consequences. There were some people in the early days of the church who were haled before the court because they would not sacrifice to the emperor. They believed emperor worship was idolatry, and that they could not affirm the Lordship of Christ and at the same time the lordship of the emperor. Many Christians were martyred because of their stand in this matter. Peter says that they must not be surprised at that treatment, and they mustn't be ashamed of it. If they suffer because they have done wrong, that's what they can expect, and they shouldn't cry about it. But if they suffer for doing what was right and good, they must bear up under that too, and meanwhile commit their souls to a righteous Creator.

"This is true today when anyone feels it his or her duty to engage in some form of protest as a matter of conscience. If the paddy wagon comes and takes you off to jail you will have to bear up under that experience. If you had done wrong it would be an indignity; but if you have not done wrong, then it need not embarrass you. I do not think a Christian should go out of his way in order to get arrested, seeking martyrdom so he can talk about it."

In April 1965, the General Assembly, as shown by its minutes, went on record with a pronouncement entitled "Civil Disobedience: The Christian and the State." It is as follows:

"This brings us to the problem of civil disobedience: the open, non-violent and conscientious refusal to obey a law or laws, as a means of appeal to a higher law, combined with the willing acceptance of the penalty. It is an extreme demonstra-

tion of dissatisfaction with some aspect of society. It also presents in its purest form the problem of the relation of the Christian to the state.

"Paul, and the Confession of Faith as well, affirm that governments are instituted by God and should therefore be obeyed. However, the civil magistrates are also bound under their charge:

" 'To protect the person and good name of all their people in such an effectual manner as that no persons be suffered, either upon pretense of religion or infidelity, to offer any indignity, violence, abuse or injury to any other person whatsoever.' (Westminster Confession, XXV, 3.)

"It needs no elaboration that within the province of our church, we have often kept silent, though men, because of race, have suffered 'indignity, violence, abuse, and injury.'

"It is true that within our system of government, means are provided, through the law, to present and adjudicate grievances for such injustices. Yet, when due course of civil law is denied or abridged, the Christian, for whom 'God alone is Lord of Conscience,' may validly appeal to the Higher Law, led by the inner witness of the Holy Spirit, speaking in and through the scriptures. This great ordering Word may lead him against the world, against the establishment of the civil magistrates. But he should be very cautious about taking such a lonely position and should hold it only in fear and trembling. If it leads him into civil disobedience, he should not try to justify his position before men. He has violated the law, the public standard of justice, and hence must recognize his liability to the judgment of the civil court.

"The church exists to unite men by God's grace with themselves, with God, and with their fellows—to make them whole. Therefore, it should give the support of Christian compassion to any member who, following his conscience in obedience to the Word, engages in civil disobedience.

"The methods of achieving justice which have been delineated here, while accomplishing in varying measures this end, cannot, in fact, bring to fruition our desire for unity in the bond of peace. Therefore, we as Christians are called upon to look

beyond these methods to work toward the reconciliation of all parties involved by encouraging dialogue in the spirit of Christian love."

A year later the 1966 General Assembly, in answering a number of overtures seeking its action on the above declaration, acknowledged "the unrest and disturbance within parts of the church" as a result of the declaration. However, it reaffirmed that statement and attempted to clarify its "spirit and intent," concluding with the following summation:

"The Presbyterian Church, U. S., desires at this time to reaffirm the obligation of all her obedient sons and daughters: (1) To live responsibly under the law of the land; (2) To use personal influence and ballot to enhance the rule of law so that injustice may be replaced with justice, and the full provisions of the law for justice, protection, and liberty may be enjoyed by every citizen of every community; (3) To regard civil disobedience as a measure of last resort to be employed only in circumstances of otherwise irremediable deed, and in the exercise of which the whole concept of law is not denied, but affirmed; and (4) To continue to support and regard with compassion those who practice civil disobedience when no legal recourse has been left open to them and who act in Christian conscience and allegiance to Almighty God."

These actions, positions and pronouncements by the general church, the local churches insist, violate fundamental faith and doctrines established long ago. They call attention to the Westminster Confession of Faith, which provides "Synods and councils are to handle or conclude nothing but that which is ecclesiastical; and are not to intermeddle with civil affairs which concern the commonwealth unless by way of humble petition in cases extraordinary; or by way of advice for satisfaction of conscience, if they be thereunto required by the civil magistrate," (Ch. XXXIII, par. 4), and "It is the duty of the people to pray for magistrates, to honor their persons, to pay them tribute and other dues, to obey their lawful commands, and to be subject to their authority, for conscience' sake. Infidelity, or difference in religion, doth not make void the magistrate's just and legal authority, nor free the people from their due obedience to him;

from which ecclesiastical persons are not exempted . . ." (Ch. XXV, par. 4). They also stress the applicability of certain provisions of the Book of Church Order, to wit: "The power which Christ has given his Church is wholly moral and spiritual, and constitutes the Church a kingdom and government distinct from the civil commonwealth. . ." (Ch. 1, § 1-2).

All these actions cannot be brushed aside as trivial and inconsequential. The General Assembly's declaration that foreordination was no longer necessary for Reformed theology was contrary to one of the basic tenets which have made Presbyterianism significantly different from other denominations. The General Assembly's endorsement of civil disobedience, which would allow a citizen to decide whether or not he will obey the law, is a radical venture into civil affairs. It is absolute defiance of law and order, and is the road to anarchy. Also, the General Assembly's recommendations as to what steps should be taken to secure peace in Vietnam is an entry into diplomatic and military matters beyond the church's function as delineated by its Westminster Confession of Faith and Book of Church Order.

These matters constituted a course of conduct by the highest level of the general church's government for a period continuing into 1966 when the withdrawal resolutions were adopted by the local churches and the instant suits were filed. None of these departures existed when these two local churches affiliated with the general church.

As we appraise it, the foregoing evidence presented an issue for the jury to decide, whether the totality of actions of the general church amounted to a substantial abandonment of, or departure from, the original tenets of faith and practice by the general church. The jury found that they did.

■ The above rulings are controlling upon all of the enumerations of error made here.

■ Under the rulings in Divisions 1 and 2, the trial court properly refused to grant appellants' oral motion to dismiss the petitions, asserting that the allegations concerning abandonment or departure from faith and doctrine are ecclesiastical questions exclusively within the jurisdiction of the church rather than the civil courts, and even if the courts are allowed to

determine such question the plaintiffs have not shown absolute abandonment.

■ The admission of testimony concerning departure from faith and doctrine by two of the appellees' witnesses was proper in view of the ruling in Division 1.

■ Denial of the appellants' motions for nonsuit, based upon the ground that the appellees' admissible evidence was insufficient to sustain their actions as pleaded, and for directed verdict, upon the ground that there was no conflict in the evidence and it was shown that all ecclesiastical questions involved rested exclusively with the church, was proper under the rulings made in Divisions 1 and 3.

■ In view of the ruling in Division 2, the trial court properly charged the jury on "substantial," rather than "absolute," as the degree or standard of abandonment of faith and doctrine by the general church they must find in order to give relief to the appellees.

We find no error in the matters enumerated as error. The judgments are therefore

*Affirmed. All the Justices concur.*

ON MOTION FOR REHEARING.

We have carefully considered all of the contentions made by the appellants and have found them not meritorious. As to the contention that this was a matter for ecclesiastical, not civil, courts, it should be pointed out that the appellants in their answer and cross action filed in each case, specifically prayed for affirmative relief as to the property in question, thereby themselves invoking rulings by the civil court as to the matters now complained of.

*The motion for rehearing is without merit, and is denied.*