Mr. Justice POMEROY concurs in the result.

Mr. Justice ROBERTS dissents for the reasons set forth in *St. John Chrysostom Greek Catholic Church v. Elko,* 436 Pa. 243.

## St. John Chrysostom Greek Catholic Church of Pittsburgh (et al., Appellant) *v.* Elko.

244

Argued November 14, 1968.  Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused December 31, 1969.

*Michael Hahalyak,* for appellant.

*John A. Metz, Jr.,* with him *Richard M. Sharp,* and *Metz, Cook, Hanna & Kelly,* for appellees.

OPINION BY MR. JUSTICE EAGEN, November 11, 1969:

This is an appeal from the final decree of the Court of Common Pleas of Allegheny County holding that St. John Chrysostom Greek Catholic Church of Pittsburgh is, and always has been since its founding in 1910, united spiritually and hierarchically with Rome. The appellant, a member of the congregation and one of several plaintiffs in the court below, contends that St. John's was founded as an independent church, and that it has always been autonomous in its government. The appellees are Nicholas T. Elko, Bishop of the Byzantine Catholic Diocese of Pittsburgh,[1] and Reverend Andrew Pataki, Pastor of St. John's Church. The appellees, of course, contend here, as they did successfully in the lower court, that St. John's is a constituent part of the Greek Catholic Church united under the Pope.[2]

The parties and the lower court all agreed that the exact issue here relates to the ecclesiastical nature of St. John's in 1910 when it was founded. This is so because the law of Pennsylvania prevents a diversion

---

[1] The Most Reverend Nicholas T. Elko was Bishop of the Pittsburgh Diocese during the proceedings in the court below. He has since been succeeded.

[2] The dispute arose when Reverend Pataki, under orders from his superiors, abolished the selection of trustees by parish election, and instituted the Council of Administration, a body composed of parishioners appointed by the parish priest. Until 1935, the Lay Control of Church Property Act, Act of April 26, 1855, P. L. 328, §7, 10 P. S. §81, placed control of church property in the hands of the church laity. With the passage of the Act of June 20, 1935, P. L. 353, 10 P.S. §81, however, control of Church property was given to the authorized representatives of the church, congregation, or religious society to which the church property was dedicated. The action of Reverend Pataki sought to effectuate the change contemplated by the 1935 act, supra.

of church property from a use to which it was originally dedicated to another inconsistent use. See the Act of April 26, 1855, P. L. 328, §7, 10 P.S. §81, as amended. See also *Schnorr's Appeal*, 67 Pa. 138 (1870) ; and *Gabster v. Mesaros*, 422 Pa. 116, 220 A. 2d 639 (1966). Thus, if St. John's was founded as a church under the authority of the Roman Pontiff, it must remain that way. Conversely, if St. John's was founded as an independent church, beyond the mandate of hierarchical authority, but possessing for itself the full measure of control and governing powers, then it must remain independent.

After an extended hearing the chancellor entered an adjudication and decree nisi ruling that St. John's was founded as a church in union with Rome. Exceptions to this adjudication and decree nisi were dismissed by the court en banc and the chancellor's decree was made final.

The chancellor looked first to the documents bringing St. John's Church into legal existence, but found them inconclusive as to the Church's nature. The chancellor then examined the rituals and practices of St. John's for all of its existence, and concluded that it was under the authority of Rome.

The appellant propounds a series of arguments, but analyzed closely, they all contest the criteria used by the lower court to determine St. John's nature. Thus, the appellant asserts that in this dispute, where the similarities between Greek Catholic independent churches and Greek Catholic Uniate (united with Rome) churches are pervasive, and where dissimilarities are obscure, ritual and practice are not valid determiners of St. John's governmental nature. The only real test, argues the appellant, is to determine the ultimate authority in St. John's; to determine whether St. John's relations with the Uniate hierarchy existed be-

cause of St. John's convenience and administrative need, or because St. John's had no choice in the matter, just as a son cannot choose his father.

The appellant, in effect, argues that the chancellor should never, in his search for the ultimate authority at St. John's have gone beyond the application for a corporate charter for St. John's filed in 1910; the exceptions filed to that application by Reverend Vasochik, a Uniate priest; the corporate charter as granted in 1910; and the bylaws, deeds and minutes of St. John's Church.

On September 3, 1910, the founders of St. John's applied for a corporate charter for the purpose of practicing religion according to the faith, doctrine, and usages of the Greek Catholic Church. On September 30, 1910, Reverend Theodosius Vasochik, who was a Uniate priest in charge of a local Uniate parish, excepted to the application, stating that the founders of St. John's were not truly Catholic, i.e., under the authority of the Pope. On November 12, 1910, a Charter was granted to St. John's in the name of "St. John Chrysostom *Autonomic* Greek Catholic Church of Pitts-. burgh" (emphasis supplied), the name having been arrived at after Reverend Vasochik excepted to the original application which bore the name "St. John Chrysostom Greek Catholic Church of Pittsburgh." The chancellor did not assign much significance to the name change, but rather surmised that it came about as a typical agreement of counsel. The lower court noted that no evidence was produced to show that Reverend Vasochik had authority from anybody to contest the original charter application, and in the absence of that kind of proof, the chancellor was reluctant to decide the present issue on the basis of the consequences of Reverend Vasochik's exceptions. Also attesting to the inconclusiveness of the Charter on the issue of St.

John's governmental nature, said the court, was the action of St. John's parishioners just a little more than one year after the Charter was granted, when, on December 23, 1911, the parishioners petitioned the Court of Common Pleas of Allegheny County to amend the corporate name to "St. John Chrysostom Greek Catholic Church of Pittburgh", which the court did on January 22, 1912. Thus the lower court, quite correctly we think, refused to decide this very important dispute by the mere recitation of the name in the Charter as granted in 1910. We agree that the several proceedings concerning the Charter must be considered together, and so considered, they are silent on the question of St. John's governmental nature.

In the above regard, the appellant asserts that the doctrine of "res judicata" establishes for all times that St. John's is independent. The argument conceptualizes the grant of St. John's Charter in 1910 as St. John's *"Autonomic"* Church as a judicial recognition and decision on the very question of St. John's independence. The grant of the Charter was hardly conclusive upon the ecclesiastical jurisdiction of St. John's. The decree of incorporation merely decided that St. John's was a proper subject for incorporation under Pennsylvania law, and that it had fulfilled all of the mandatory conditions precedent to incorporation under the law of Pennsylvania.

Furthermore, we agree with the chancellor that an isolated consideration of St. John's bylaws and minutes cannot answer the jurisdictional question at hand. The records, to be sure, contain infrequent assertive statements directed against certain aspects of the Uniate influence at St. John's; for example, in 1931, the parishioners placed an interdict against the mention in the Mass of the name of Bishop Takach, the Bishop of the Pod Carpathian Diocese, because of his stand on

the issue of priestly celibacy, and because of the permission given by him to certain of St. John's parishioners to start a new parish at a different location which, of course, resulted in a diminution of St. John's population. The records of such incidents seem to us, however, to be no more conclusive as to St. John's governmental nature than the very facts of such occurrences, all of which were not only well known to the chancellor, but were also considered by him in arriving at his decision. But besides the fact that the recordation of some facts does not make them weightier than others, another reason precludes the bylaws from being the determiner of the real authority at St. John's. Until 1935, church property was held, by force of the Lay Control of Church Property Act, Act of April 26, 1855, P. L. 328, §7, 10 P.S. §81, subject to the direction and control of the lay members of the congregation. This control could not have been accomplished without bylaws and the bylaws could not help but reflect the authority and power actually reposed in the lay trustees by the statute. These assertions, however, are not inconsistent with hierarchical control, and hence cannot be relied upon to decide the question. The lower court so held, and we agree.

The chancellor, having concluded that St. John's records failed to locate its legitimate and ultimate authority, looked to and examined the entire history of the church to locate that authority.[3] That examina-

---

[3] The court really utilized what might be called the "Living-Relationship Test." See Judicial Intervention in Disputes Over The Use of Church Property, 75 Harv. L. Rev. 1142, 1162, where the following language appears: "It seems far preferable to look to the lines of church authority as they existed just before the dispute impaired them. Courts using this approach have emphasized such factors as whether the local organization accepted ministers appointed by diocesan executives, regularly sent delegations to denominational convocations, received financial assistance from the

tion resulted in extensive findings, the most important of which we will narrate next.

The parishioners of St. John's emigrated from Central Europe to the Pittsburgh area from about 1880 onward. The area in Europe from which they came was called Pod Carpathia, and is now eastern Czechoslovakia. The Pod Carpathians are Slavs, and until the early 1900's were ruled by the Hungarian Empire. They lived in dire economic conditions and, having an almost feudal-type existence, were anxious for a better life. When they came to America, they naturally tended to keep to themselves, since they were quite distrustful of others.

Historically, the Pod Carpathians were practitioners of Orthodox faith[4] from the time of the Schism of 1054[5] until the middle of the seventeenth century, when a general reunion with Rome began. By the eighteenth century, the Pod Carpathians were steadfast in their allegiance to the Pope, partly because the Austro-Hungarian rulers were the titular successors to the Holy Roman Empire. When the Pod Carpathians emigrated here from Europe, they were universally Uniate, knowing neither Orthodoxy nor independence.

---

general church, or made payments to the funds of the general church. This inquiry has the advantage of directing the court's attention to the prevailing understanding within the Church and of eliding difficult questions of the construction of ecclesiastical documents."

[4] The term "Greek Catholic" can now encompass three types of ecclesiastical entities: (1) Independent Churches; (2) Orthodox Churches under a Patriarch; and (3) Uniate Churches (those under Rome).

[5] The Schism of 1054 effected a complete break in the Christian Church, dividing it into the Eastern and Western Rites; specifically it was a break between the Patriarch of Constantinople and Rome.

The emigrants came here in huge numbers, and the Vatican was not sufficiently prepared to provide them with a going church administration of their own ethnic background. Consequently the Slavs were placed under Latin Rite Bishops, a circumstance not pleasing to the emigrants who mistrusted the Western Church. The emigrants therefore adopted the "trustee" system which allowed them to keep church property out of the hands of the Western Bishops. Even when the Greek Catholics were given their own bishops, difficulties seemed to appear which prevented a complete administrative fusion between the local parish and the diocese.

The people who became the parishioners of St. John's settled in the Frankstown area of Pittsburgh. Until they formed their own church, they attended two local churches, both of which were Uniate. In the summer of 1910, these people decided to found their own church. In early September 1910, the first Mass was said by a Uniate priest, Reverend Alexis Petrasovich, who was ordained in 1863 by the Bishop of Presov, a Uniate Diocese in Pod Carpathia. Reverend Petrasovich remained a Uniate priest in good standing with the church hierarchy until his death in 1929.

The first recorded minutes of St. John's reveal that the parishioners intended to fall under the authority of the Bishop of Presov (a European Uniate hierarch) until their own bishop was appointed.

All of the eight priests who have served St. John's Church from its beginning have always been Uniate, and have always mentioned the Pope[6] in the Mass. All

---

[6] The ritualistic, liturgical and theological differences among the Greek Catholic Church in union with Rome, the Orthodox Greek Catholic Church and the independent Greek Catholic Churches are indiscernible to all but the most sophisticated observer. The signal difference between the Greek Catholic Church in union with Rome and Orthodox Greek Catholic Church is that in the former, the

have requested and received permission from the Uniate bishop for the dispensation of marriage banns. Moreover, St. John's has been frequently visited by Uniate bishops and church administrators.

Significantly, the parishioners of St. John's have always sought to redress grievances through the established hierarchical channels of the Uniate church, and not by self-action. For example, the church minutes of 1927 show some dissatisfaction with Reverend Volensky, the parish priest. Protest was lodged with the Uniate bishop, who informed a committee of St. John's parishioners that Reverend Volensky could be ordered to leave St. John's only by him. In an independent parish, a disliked priest would have been discharged by the parishioners.

The chancellor also noted that the Catholic Directory, an official computation of all parishes and priests of the Roman Catholic Church in the United States, listed St. John's as a Ruthenian Church of the Pittsburgh Diocese from 1912 to 1924. Thereafter, the Greek Catholics had their own diocese. The chancellor concluded that an independent church would not be listed in the Catholic Directory.

Additionally, 73 of the 74 founders of St. John's Church acknowledged on membership cards of the Greek Catholic Union, a national fraternal and benevolent association, that they were either Greek Catholics in union with Rome, or Roman Catholics.

Cathedraticum is a payment made for the support of the bishop. In the 55 years of its existence, St. John's Church has made such payments for 50 years, amounting to $30,000. The chancellor found that no evidence was produced to show that the payments were made out of courtesy.

---

Pope is mentioned at three places in the Mass, while in the latter, the Patriarch is mentioned.

St. John's has, over the years, contributed over $4000 in voluntary contributions to the Holy See at Rome. Additionally, projects of the Uniate Diocese have always been vigorously supported by the parishioners of St. John's. In 1947 for example, when the Uniate Diocese was erecting a new seminary, St. John's assessment, which was paid in full by the parish, was $10,000, the highest in the diocese.

Several times in St. John's history, the ruling Uniate bishop has fallen into disfavor with the parishioners of St. John's. For example, Bishop Takach was strongly disliked by the people, mainly because of his position on priestly celibacy, and because of his permission given to some of St. John's parishioners in 1931 to leave St. John's and erect a new parish elsewhere. The dispute was generated by the decision of St. John's in 1931 to erect a new church. Some favored the existing location as the site for the new church, while others, those who were permitted to leave St. John's, favored a new location. The remaining parishioners showed resentment to Bishop Takach for allowing a diminution in St. John's population, but the chancellor found this resentment to be personal, for Bishop Takach's successors were greatly respected by St. John's. Even the harsh feelings against Bishop Takach found expression through the legitimate channels of the Uniate Church which existed for the redress of grievances.

The chancellor noted that there was nothing in the Church minutes showing a hiring or discharge of any priest by either the trustees or the congregation of St. John's. In 1959, eight Uniate priests were ordained in a ceremony at St. John's. The chancellor concluded that such a ceremony could not take place at an independent or Orthodox Church.

A faculty is permission from a Catholic bishop to a priest to receive a convert into the Church. Many

faculties have, over the years, been granted to the priests at St. John's. The chancellor concluded that a Uniate Bishop would not have granted faculties to an independent or an Orthodox Church.

The profession of faith recited by all converts upon entering St. John's membership shows unmistakably their allegiance to the Pope of Rome.

The souvenirs and memorabilia of the commemorative events of the history of St. John's contain pictures of Uniate bishops and priests; even the church cornerstone contained a Uniate catechism. Of the 828 parishioners buried from St. John's, 97.1% of them were buried in Catholic cemeteries in union with Rome; all of the church founders were buried in Uniate cemeteries.

In evaluating the correctness of the lower court's conclusions based upon the above findings (that the history of St. John's clearly shows that it is a church in union with Rome) we are bound by the oft-repeated rule that the chancellor's fact findings approved by the court en banc have the effect of a jury verdict and limit our review to a determination of whether such findings are supported by sufficient evidence and whether the lower court abused its discretion or committed an error of law. *Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 428 Pa. 350, 237 A. 2d 342 (1968); *Jacobson & Co. v. International Environment Corporation*, 427 Pa. 439, 235 A. 2d 612 (1967); *McCown v. Fraser*, 327 Pa. 561, 192 A. 674 (1937). In our opinion, the record lends substance to the chancellor's findings, and those findings support the lower court's conclusion that St. John's is a Uniate Church. Accordingly, we affirm.

Finally, we must note that the recent case of *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S.

440, 89 S. Ct. 601 (1969), is totally inapposite here, and does not preclude our examination of the ritual and practice of St. John's to decide its ecclesiastical nature. In *Presbyterian Church*, a local Presbyterian congregation tried to break away from the General Assembly, the highest source of authority in the Presbyterian Church, and to take the local church property with it, because of an alleged departure by the General Assembly from the traditional religious tenets of the Presbyterian religion. Pursuant to Georgia law, a jury decided that the General Assembly had violated traditional beliefs thereby forfeiting its right to hold the local church by a trust. The Supreme Court of the United States reversed the Georgia Supreme Court and held that the departure-from-doctrine element of the implied trust theory was unconstitutional. In effect, the decision in *Presbyterian Church* precludes civil court examination of church doctrine to resolve church property disputes occurring in an hierarchical church organization which is itself furnished with an established church judicatory, an ultimate ecclesiastical authority, quite able to decide the question.

Here, the nature of the controversy is very much unlike that in *Presbyterian Church*, supra. There, the local church was admittedly a constituent part of the hierarchical structure and contended that it had a right to withdraw from that organization. The alleged right to withdraw centered on a matter of interpretation of church beliefs which civil courts cannot constitutionally do. Here, the very question is, "was St. John's, from its beginning, a constituent part of the Greek Catholic Church in union with Rome, or was it, from its beginning, independent of any church hierarchy, and self-governing?" There can be no departure from doctrine or practice in this case because the ecclesiastical origin and allegiance of St. John's is the very

question in dispute. Here, there is no established church judicatory to which to remand the decisive issue, and so no right of a religion is violated by this Court's resolution of the issue. Furthermore, our result has been attained by considering purely factual matters which relate to the kind of church St. John's is; we have not had to consider the significance and relevance of church doctrine.

The appellants, thorough in their quest, have presented a few more arguments, but they can be and are dismissed without discussion.

Decree affirmed. Each party to pay own costs.

_____

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I am compelled to dissent from the majority's decision in this case as well as its decisions in two companion cases,[1] all of which are concerned with church property disputes between local and general church organizations. In my view, our disposition of all three cases is governed by the recent decision of the United States Supreme Court in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S. Ct. 601 (1969). I believe that the majority of our Court has examined factors beyond the pale of consideration permissible under that decision and has read it too narrowly by concluding, in effect, that it *only* applies to cases involving a departure-from-doctrine rule.

In *Presbyterian Church*, 224 Ga. 61, 159 S.E. 2d 690 (1968), the Georgia court inquired into whether the general church had so substantially departed from the tenets of faith existing at the time of the local

_____

[1] *St. Michael and Archangel Russian Orthodox Greek Catholic Church v. Uhniat*, 436 Pa. 222, 259 A. 2d 862 (1969) and *The Pilgrim Holiness Church v. Pilgrim Holiness Church of Athens Township*, 436 Pa. 239, 259 A. 2d 870 (1969).

churches' affiliation that the trust in favor of the general church must be considered terminated. The United States Supreme Court held that such an inquiry was constitutionally impermissible. Relying in part on the reasoning of *Watson v. Jones*,[2] which it characterized as leaving "the civil courts *no* role in determining ecclesiastical questions in the process of resolving property disputes," the Court stated that the First Amendment "commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine." 393 U.S. at 447, 449, 89 S. Ct. at 605, 606.

*Presbyterian Church* recognized only the narrow exception to that rule articulated in *Gonzales v. Archbishop*, 280 U.S. 1, 50 S. Ct. 5 (1929) (BRANDEIS, J.) that civil courts could inquire into whether "fraud, collusion, or arbitrariness" were involved in a determination of a church tribunal. The Court further stated that while the First Amendment "severely" circum-

---

[2] 13 Wall. 679 (1871). *Watson* was decided under common law, the federal courts taking jurisdiction through diversity, but *Watson* also had First Amendment roots, and its constitutional basis was ultimately confirmed in *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S. Ct. 143 (1952). *Watson* itself turned on a distinction between hierarchical and congregational churches, and concluded that hierarchical ecclesiastical decisions must be enforced by the civil courts. While this theory is adopted by the majority in the cases now before this Court, I do not believe that it can withstand analysis in light of the broader strictures which *Presbyterian Church* places on the civil courts in deciding church property disputes. I do not believe it likely that the Supreme Court of the United States would have heard and so decided *Presbyterian Church* in order to do no more than what had already been done in *Watson*, especially since the very issue which controls in a *Watson* determination, whether a church is hierarchical or congregational, would appear to be an ecclesiastical question within *Presbyterian Church*. See Comment, 54 Iowa L. Rev. 899, 905-06 (1969).

scribes the role that civil courts may play in resolving church property disputes," 393 U.S. at 449, 89 S. Ct. at 606, they may still open their doors to such disputes. "[T]here are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." Id.

The Supreme Court's interpretation of the First Amendment in *Presbyterian Church* is primarily proscriptive in force. It clearly tells us what we may not do, but does not and could not mandate any specific approach to the resolution of church property disputes. Any approach is constitutional under the rationale of *Presbyterian Church* so long as no matter of religious doctrine is considered at any point in the proceeding.

The majority in the instant case, however, runs afoul of the constitutional prohibition announced in *Presbyterian Church*. To demonstrate how the majority becomes entwined in an "ecclesiastical thicket," we need only look at its analysis in this case. Under the majority's theory, a court must determine the local church's polity, here, whether St. John's was founded under the authority of the Roman Pontiff, or as an independent church. To answer this question, the chancellor examined the ritual and practices of St. John's for all its existence.

The majority notes that this is a proper method for determining St. John's ecclesiastical nature. Utilizing this approach, it attaches singular significance to the fact that the priests who have served at St. John's have always mentioned the Pope, rather than the Patriarch, in the Mass. That fact is important because this Court is now deciding that invoking the name of the Pope constitutes the "signal difference" between the Greek Catholic Church in union with Rome and the Orthodox Greek Catholic Church. The majority then

adds that the "ritualistic, liturgical and theological differences among the [churches] . . . are indiscernible to all but the most sophisticated observers." Perhaps. But this is something for theologians to enunciate, not civil courts.

The majority also considers it important that the Catholic Directory, an official computation of all parishes and priests of the Roman Catholic Church in the United States, listed St. John's; that a Uniate Bishop would not have granted permission to priests at St. John's to receive converts; that the profession of faith recited by converts upon entering St. John's "unmistakably" shows their allegiance to the Pope of Rome; that the church cornerstone contained a Uniate catechism; that souvenirs and memorabilia of the commemorative events of St. John's contain pictures of Uniate bishops and priests; and that all the church founders were buried in Uniate cemeteries.

This attempt to ascertain the polity of St. John's has involved the majority in the exact type of determination condemned in *Presbyterian Church*. As the majority properly notes, a determination of St. John's polity cannot be accurately made without an examination of the above factors. But, by examining these factors, the majority is deciding what ecclesiastical matters are important to each of the contending religions. The majority is determining "matters at the very core of a religion—the interpretation of particular church doctrines and the importance of these doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role." *Presbyterian Church*, 393 U.S. at 450, 89 S. Ct. at 607.

The majority has also misapplied *Presbyterian Church* in *St. Michael and Archangel Russian Orthodox Greek Catholic Church v. Uhniat*, 436 Pa. 222, 259 A. 2d 862 (1969). The majority states that *Presbyteri-*

*an Church* is designed to "foster denominational continuity and doctrinal evolution by making the decision of the Church tribunal the last word in the settlement of a church dispute arising in a hierarchical church organization." But *Presbyterian Church* holds the exact opposite. "The First Amendment prohibits a State from employing religious organizations as an arm of the civil judiciary to perform the function of interpreting and applying state standards." 393 U.S. at 451, 89 S. Ct. at 607. The ownership of church property is to be decided by the civil courts, applying neutral principles of law. Any theory grounded in a policy of favoritism towards hierarchical, or congregational, church organizations is clearly unconstitutional. Cf. *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 119, 73 S. Ct. 143, 156 (1952) (condemning civil rule, established by statute, that "intrudes for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment"); see also *Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 80 S. Ct. 1037 (1960).

Finally in *The Pilgrim Holiness Church v. Pilgrim Holiness Church of Athens Township,* 436 Pa. 239, 259 A. 2d 870 (1969), the majority consistent with its position in the two previously discussed cases, believes that the controlling issue is whether or not the church involved is hierarchical. This, as I have previously noted, will involve the consideration and utilization in the court's decisional process of ecclesiastical matters inadmissible under *Presbyterian Church.*

I would adopt instead the "formal title" approach to church property controversies. Under that approach, "the title-holder of the property has the right to determine the use of the property with neither theology nor administrative church law as relevant considerations. Churches need not be classified as

either hierarchical or congregational as in the *Watson [v. Jones]* approach. The civil courts under this alternative would enforce deeds, reverter clauses, and general state corporation laws in the same manner as in resolving any property dispute." Comment, 54 Iowa L. Rev. 899, 907 n.53 (1969). Cf. *Presbyterian Church,* 393 U.S. at 452, 89 S. Ct. at 607 (HARLAN, J., concurring).

This theory has the advantage of almost never involving a court with the vexing problem of whether proffered evidence is admissible under the First Amendment. Further, adjudicating church property disputes by relying on formal title will ensure a more even-handed administration of justice, since the necessary evidence will almost always be admissible. Unlike the majority's approach, the formal title approach will never involve civil courts in deciding what the polity of a given church is, a determination which will almost inevitably involve ecclesiastical considerations.

One final advantage inherent in this approach is that it invites and encourages religious organizations to title their property as clearly and unambiguously as possible. Such a result was obviously within the contemplation of *Presbyterian Church* wherein the United States Supreme Court admonished that "[s]tates, religious organizations and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." 393 U.S. at 449, 89 S. Ct. at 606.

On the remand of *Presbyterian Church,* the Georgia Supreme Court followed the formal title doctrine, holding that the local congregations were entitled to the property, see 225 Ga. 259, 167 S.E. 2d 658 (1969) (petition for certiorari filed). The Georgia Court looked only to the deeds originally conveying the church property to the religious groups. The named recipients of

the property in the deeds were the local congregations. As a result, the local congregations were held entitled to the property.

Courts other than those of Georgia have also utilized the formal title approach.[3] I believe that we should follow their lead, and hence I would vacate the decrees and remand these three cases so that a determination of record title can be made.[4]

[3] For what I consider an excellent example of a formal title resolution of a complicated fact situation, involving who had the right to occupy church property and select a minister to preach therein, see *Master v. Second Parish of Portland*, 124 F. 2d 622 (1st Cir. 1941) (MAGRUDER, J.). See also *First English Lutheran Church v. Evangelical Lutheran Synod*, 135 F. 2d 701 (10th Cir.), cert. denied, 320 U.S. 757, 64 S. Ct. 65 (1943) (diversity case, utilizing formal title approach); *Bonacum v. Murphy*, 71 Neb. 463, 104 N.W. 180 (1905) (stressing need for establishing formal title).

[4] Although the record in *The Pilgrim Holiness Church*, supra, indicates who has title, I would still remand to ensure a proper determination of this issue, since the record was presumably established with the parties being unaware that title was the crucial issue.